## CHARLEY REED *v*. THE STATE.

1. SEVERANCE.—The Code of Procedure, article 649, provides that a severance may be had by any one of several defendants jointly prosecuted; and, if the severance is sought for the purpose of obtaining a co-defendant's evidence, it is required that the applicant file his affidavit stating that fact and that the evidence of his co-defendant is material to his defense, and further alleging that there is no evidence against the co-defendant. Literal adherence to the language of the Code is not necessary in the affidavit, and it is sufficient if it substantially complies with the requirements prescribed. In the present case the applicant swore that he "verily believed" there was no evidence against the co-defendant, and this is *held* sufficient.

2. SAME.—But the allegation that there is no evidence against the co-defendant may, it seems, be controverted by the State; and a previous trial and conviction of the co-defendant would be suffi-

cient, *prima facie*, to rebut the allegation, and to authorize the trial court to disregard the affidavit, unless the conviction had been reversed on appeal because of the want of evidence against the party.

3. Self-Defense.— In a trial for murder the court charged the jury that an adulterer, caught in the act of adultery, has no right to resist an attack made upon him by the husband. *Held*, that the instruction is erroneous because it deprives the slayer absolutely and entirely of all right of self-defense, regardless of the legal principles which, while according that right plenarily to him only who acts from necessity and is himself without fault, do not wholly deny it to him who, when caught in the perpetration of a misdemeanor and assaulted by the person aggrieved thereby, kills the latter to save his own life. Adultery is only a misdemeanor in this State, and therefore the instruction given to the jury transcends the law. See the opinion *in extenso* on the distinction between the perfect and imperfect right of self-defense.

4. Same.— The amenability of a person charged with crime is conditioned solely on his own acts, and is never dependent upon the immunity of the injured person in case the result had been different. Therefore, though the Penal Code justifies the husband in slaying a person when taken in the act of adultery with the wife, it does not follow that the adulterer is guilty of murder if, being attacked by the husband, he kills him to save his own life. Under such circumstances manslaughter would be the maximum of culpability.

Appeal from the District Court of Cooke.    Tried below before H. E. Eldridge, Esq., Special Judge.

The indictment in this case was filed August 7, 1880, and charged that the appellant and Amanda White, on March 17, 1880, of their express malice aforethought killed and murdered Frank White by shooting him with a pistol. The trial of appellant resulting in this appeal was had in September, 1881, and resulted in his conviction for murder in the second degree, and the assessment of his punishment at a term of nine years in the penitentiary. On application of the district attorney a severance of the defendants was ordered by the court, and appellant was first put upon trial. He had previously applied for a severance for the purpose of having Amanda

White first tried, with the view of using her as a witness in case she should be acquitted. The character and disposition of his application are disclosed in the opinion of this court.

Defendant and the deceased were colored people, as were also most of the witnesses. The deceased and his wife Amanda had separated, and for some weeks prior to the homicide she had been living in a room which she rented in the town of Gainesville. Defendant boarded with her and lodged in her room, of which he was the only inmate besides herself. About midnight of the 17th of March, 1880, a crashing noise, followed immediately by two or three reports of fire-arms, was heard to proceed from the room occupied by Amanda and the defendant. The neighbors hurried to the scene and found the door broken down from the outside, Frank White dead upon the floor, and Amanda apparently in great distress. The defendant was not in the house, but the first witness who reached there saw him running off.

In volume 10 of these Reports, at page 381, will be found the case of Amanda White on appeal from a conviction for murder in the second degree, had upon the same indictment brought up in the present record. The report of that case gives in detail the testimony of the numerous witnesses who testified at the trial of Amanda in the court below. Not all of those witnesses were examined at the trial of the present appellant, but the testimony of those who were was substantially the same as that which they gave in the case referred to, and consequently need not be reproduced in the present case. At the appellant's trial, however, a few witnesses testified who were not examined when Amanda White's case was tried, and among them was Ann Brockman, probably the wife or widow of Dick Brockman, who testified for the State against Amanda White, but was not produced at the trial from which this appeal results.

Testifying for the State, Ann Brockman said that she knew Frank White, the deceased. When he was killed his wife, Amanda, lived in a room which adjoined the one occupied by witness, and had lived there for three or four weeks before her husband's death. About a week after Amanda moved there the defendant began staying in the same room with her. It looked like they were living as man and wife; no one else stayed there but them. About nine o'clock in the night Frank White was killed, the defendant came to the room of witness and said he was going to take his things and leave Amanda's room,— that he did not want to hurt Frank and did not want Frank to hurt him. He said he had lay in jail six months for a smaller woman than Amanda. When the defendant came to witness's, Amanda was not at home, and as soon as she came home he went to her room. Witness heard him tell Amanda in substance what he had previously said to witness,— that he did not want to hurt Frank nor Frank to hurt him, and that he was going to take his things and leave; to which Amanda replied, "You don't suppose I am going to let Frank come here and kick your things out after I have taken you in?" Amanda then went and bolted her door, and the defendant said to her, "Don't be shoving them bolts behind me,— I am going to take my things and go." Witness went to bed and to sleep, and heard nothing more said by Amanda and defendant. The shooting awakened witness, and she heard people come to the house, but did not go into Amanda's room.

On cross-examination the witness said that the partition between her room and Amanda's did not reach the ceiling. She awoke in time to see the flash of the last shots that were fired. In her room and Amanda's it was perfectly dark except the flash of the pistol. It was a dark, cloudy and moonless night. Some one who came to the house lit witness's lamp and took it into Amanda's

room. That was the first light there of any kind after the shooting, and several persons had got there then. Witness has no clock, and it may have been later than nine o'clock when the defendant came to her room.

Rhoda Davidson, who was a State's witness against Amanda White, was introduced and examined by the defense in the present case. She stated that on the night Frank White was killed the defendant came to Mr. Fletcher's, where witness was living, and asked witness if Amanda was there. Deceased and Amanda were then in witness's room, talking. Defendant threw upon a chair the key to Amanda's house, and told witness to tell Amanda he would not see her again that night. When the deceased and Amanda came out of the room, witness gave the key to the latter and told her what the defendant had said. When Amanda left she asked witness to go with her and stay all night. She had secured a room of Fletcher, where witness lived, and had arranged to move into it the next morning. She and her husband, the deceased, were going to live together again; witness heard her tell him she would try him again if he would give her things back to her.

Charles Bruce, for the defense, testified that he owned the house in which Amanda White was living when her husband was killed. About a week or more after she moved into the house, the defendant began boarding with her. One day before Frank White was killed, the witness went to collect his rent from Amanda, and she did not have the money. The defendant was there, and she asked him if he could pay his board. There was a narrow bed in the room, and also a pallet on which the defendant slept. For a week or two after Amanda rented the room a girl stayed there with her. The room was a very small one, and Amanda and defendant were its only occupants when deceased was killed. Witness reckoned that the defendant was a select boarder.

Wiley Wilson, for the defense, stated that he and his wife were at Amanda's the evening preceding the killing, and stayed there until about half past ten o'clock. The door of Amanda's room was not broken at that time. Defendant boarded there and slept there on a pallet; witness had been there often when the pallet was made down for the defendant.

Mary Wilson, for the defense, stated that she was Amanda's sister, and was at Amanda's the evening the defendant applied to the latter for board. Amanda told him she would charge him two dollars and a half per week; for which he was to have board and lodging, and she was to do his washing and ironing. Witness had seen the defendant pay money to Amanda.

The other testimony is comprised in the case of Amanda White, 10 Texas Ct. App. 381.

*R. Sarlls*, for the appellant.

*H. Chilton*, Assistant Attorney General, for the State.

WHITE, P. J. Appellant and Amanda White were jointly indicted for the alleged murder. Appellant filed his affidavit and asked a severance in the following terms, viz.: "Personally appeared before me Chas. Reed, one of the defendants, who, after being duly sworn, says that he verily believes that there is no evidence against Amanda White, who is jointly indicted with him, and that her evidence is material for his defense; therefore he asks the court to grant him a severance and try Amanda White first; which severance is asked for the purpose of procuring her evidence in his defense." In his explanation to the bill of exceptions the judge presiding states that the court refused and overruled the application, "which the court declares insufficient to entitle defendant to have his co-defendant, Amanda White, tried first." No other

ground is assigned for the action of the court, and therefore we will take it for granted that there was no other.

If the statute is referred to we think it must be apparent that the ruling was erroneous inasmuch as the affidavit quoted is in substantial if not literal compliance with its provisions; which are, "Where two or more defendants are jointly prosecuted they may sever in the trial at the request of either; and if the defendant upon whose application the severance is allowed shall file his affidavit in writing, stating that a severance is requested for the purpose of obtaining the evidence of one or more of the persons jointly indicted with him; that such evidence is material for his defense, and that there is no evidence against the person or persons whose evidence is desired, such person or persons shall be first tried." Code Crim. Proc. art. 669.

But whilst an affidavit of this character might be sufficient whether in exact or substantial compliance with the statute, still we imagine the severance would not be a matter of right; but the facts stated might and could be controverted by a showing on the part of the State that it was not true that there was no evidence against the co-defendant whose evidence was desired; and a trial and conviction of such defendant upon said charge would be sufficient *prima facie* to rebut the affidavit and authorize the court to disregard and overrule it, even though such conviction may have been reversed on appeal to the court of last resort, unless such reversal was on account of the want of sufficient evidence to support the verdict and judgment. No such ground is assigned for overruling the application, and inasmuch as the ruling was predicated solely upon its supposed insufficiency under the statute, the ruling was manifestly erroneous.

We propose next to notice what in our opinion constitutes the only remaining error shown by the record. In the 13th paragraph of the court's charge to the jury they

were instructed that "When the husband takes a party actually engaged in the act of adultery with his wife, and he then and there attacks the adulterer, *the adulterer is not justified in resisting such attack;* but when the husband has knowledge that his wife is thus living in adultery with another, and connives at and acquiesces in the adulterous connection, he would have no right to kill or inflict serious bodily injury on the adulterer. If you believe from the evidence that defendant Charley Reed and Amanda White were living in adultery at the time of the killing, and that Amanda White was at that time the wife of deceased, and that defendant and Amanda White were then and there, at the time of the killing, taken in the actual act of adultery by Frank White, before defendant and Amanda White had separated, and that Frank White then and there made an attack on defendant, *defendant had no right to resist such attack, and an attack made upon defendant under such circumstances does not come within the definition of self-defense.*" We have italicised the objectionable portions of this charge.

Evidently the court must have based this charge upon the converse of the proposition stated in article 567 of the Penal Code, which declares that "homicide is justifiable when committed by the husband upon the person of any-one taken in the act of adultery with the wife, provided the killing take place before the parties to the act of adultery have separated." In other words, the controlling idea intended to be conveyed by the court, according to our construction of the language used, seems to have been that, because the law would justify the husband in taking the life of the adulterer under the circumstances named in the statute, it would follow that the adulterer must submit to the infliction of death thus attempted to be executed upon him, and that he was not even authorized to *resist* an attack upon his life by the injured hus-

band, much less plead such deadly attack by way of justification or self-defense if in resisting such attack he was compelled to take the life of the injured husband to save his own.

Thus it appears that the court has attempted to make the legal *status* of the defendant depend upon what might or would have been the law with reference to the act of deceased, had the situation of the parties been reversed and the latter had taken the life of the former. In no possible state of case would such a rule of deduction be a fair or conclusive criterion in the administration of criminal law. The accused is always guilty or innocent from his own stand-point, that is, his personal, individual acts with relation to the matter charged.

Love of life and its preservation is the first great law of nature. Sir Wm. Blackstone says: "Self-defense, therefore, as it is justly called the primary law of nature, so it is not, neither can it be in fact, taken away by the law of society. In the English law, particularly, it is held an excuse for breaches of the peace, nay, even for homicide, but care must be taken that resistance does not exceed the bounds of mere defense and prevention; for then the defender would become the aggressor." 2 Cooley's Black., Book III, chap. 1, p. 44.

But the right of self-defense, though inalienable, is and should to some extent be subordinated to rules of law, regulating its proper exercise, and so the law has wisely provided. It may be divided into two general classes, to wit, perfect and imperfect right of self-defense. A perfect right of self-defense can only obtain and avail where the party pleading it acted from necessity, and was wholly free from wrong or blame in occasioning or producing the necessity which required his action. If, however, he was in the wrong,—if he was himself violating or in the act of violating the law,—and on account of his own wrong was placed in a situation wherein it be-

came necessary for him to defend himself against an attack made upon himself which was superinduced or created by his own wrong, then the law justly limits his right of self-defense, and regulates it according to the magnitude of his own wrong. Such a state of case may be said to illustrate and determine what in law would be denominated the imperfect right of self-defense. Whenever a party by his own wrongful act produces a condition of things wherein it becomes necessary for his own safety that he should take life or do serious bodily harm, then indeed the law wisely imputes to him his own wrong and its consequences to the extent that they may and should be considered in determining the grade of offense which but for such acts would never have been occasioned.

Mr. Bishop says: " The rule is commonly stated in the American cases thus,— if the individual' assaulted, *being himself without fault,* reasonably apprehends death or serious bodily harm to himself unless he kills the assailant, the killing is justifiable." 1 Bish. Cr. L. § 865. But a person cannot avail himself of a necessity which he has knowingly and wilfully brought upon himself. *State* v. *Neely,* 20 Iowa, 108; *Adamas* v. *People,* 47 Ill. 376; *State* v. *Starr,* 30 Mo. 270. That is, it will not afford him a *justification* in law. See 2 Cooley's Black., Book IV, chap. 14, p. 180. How far and to what extent he will be excused or excusable in law must depend upon the nature and character of the act he was committing and which produced the necessity that he should defend himself. When his own original act was in violation of law, then the law takes that fact into consideration in limiting his right of defense and resistance whilst in the perpetration of such unlawful act. If he was engaged in the commission of a felony, and, to prevent its commission, the party seeing it or about to be injured thereby makes a violent assault upon him, calculated to produce death or serious bodily harm, and in resisting such attack he slay

his assailant, the law would impute the original wrong to
the homicide and make it murder.    But if the original
wrong was or would have been a misdemeanor, then the
homicide growing out of or occasioned by it, though in
self-defense from an assault made upon him, would be
manslaughter under the law.

If we apply this view of the law to the supposed case
stated by the court in the charge to the jury, which we
have quoted above, then the charge is manifestly erro-
neous.    It is erroneous in that it deprives the defendant
absolutely of his right of resistance and self-defense.    If
defendant was taken by deceased in the act of adultery
with his wife, and to avenge the wrong deceased made a
dangerous or murderous assault upon him, in resisting
which he took the life of deceased, under such state of
facts defendant would be guilty of manslaughter, because
he was committing a misdemeanor which was the cause
of and brought about the necessity for the homicide.
Adultery, under our statute, is only a misdemeanor, and
punishable by fine of not less than one hundred nor more
than one thousand dollars.    Penal Code, arts. 333–336.
Carried to its legitimate extent, the charge of the court
would make adultery a felony, punishable with summary
death, because it would require the defendant to submit
to death without an attempt even to defend or preserve
his life.

For error in the charge of the court as above discussed,
the judgment is reversed and the cause remanded.

*Reversed and remanded.*