## ROWE v. UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF ARKANSAS.

No. 439. Submitted October 22, 1896. — Decided November 30, 1896.

On the trial of a person indicted for murder, the defence being that the act was done in self-defence, the evidence on both sides was to the effect that the deceased used language of a character offensive to the accused; that the accused thereupon kicked at or struck at the deceased, hitting him lightly, and then stepped back and leaned against a counter; that the deceased immediately attacked the accused with a knife, cutting his face; and that the accused then shot and killed his assailant. The trial court in its charge pressed upon the jury the proposition that a person who has slain another cannot urge in justification of the killing a necessity produced by his own unlawful acts. *Held,* that this principle had no application in this case; that the law did not require that the accused should stand still and permit himself to be cut to pieces, under the penalty that, if he met the unlawful attack upon him, and saved his own life by taking that of his assailant, he would be guilty of manslaughter; that under the circumstances the jury might have found that the accused, although in the wrong when he kicked or kicked at the deceased, did not provoke the fierce attack made upon him by the latter with a knife in any sense that would deprive him of the right of self-defence against such attack; and that the accused was entitled, so far as his right to resist the attack was concerned, to remain where he was, and to do whatever was necessary, or what he had grounds to believe at the time was necessary, to save his life, or to protect him from great bodily harm.

If a person, under the provocation of offensive language, assaults the speaker personally, but in such a way as to show that there is no intention to do him serious bodily harm, and then retires under such circumstances as show that he does not intend to do anything more, but in good faith withdraws from further contest, his right of self-defence is restored when the person assaulted, in violation of law pursues him with a deadly weapon and seeks to take his life, or do him great bodily harm.

THIS was an indictment for murder, alleged to have been committed by the plaintiff in error, in the Cherokee Nation, Indian Territory, on the 30th day of March, 1895, — the person killed, Frank Bozeman, being a white man and not an Indian. The verdict was guilty of manslaughter, and a motion for new trial having been overruled, the accused was sentenced to imprisonment in the penitentiary at Columbus, Ohio, for the term of five years, and to pay to the United States a fine of five hundred dollars.

The following agreed statement as to the evidence is taken from the record:

"The testimony on the part of the government tended to show that on the evening of the 30th of March, 1895, the defendant, David Cul Rowe, who is a Cherokee Indian, and the deceased, Frank Bozeman, a white man, a citizen of the United States, and not an Indian, met at a hotel at Pryor's Creek, Indian Territory, at the supper table; that the defendant appeared to be drinking, but was not much intoxicated; that defendant said that he had his gun, and that he had a right to carry it, as he was a 'traveller'; that he had made a gun play in that town on one occasion and he would make another one; that he said to deceased, 'What do you think of that?' The deceased did not reply, and defendant said to him, 'God damn you, I'll make you hide out or I'll make you talk to me'; that in a short time deceased got through his supper and walked out into the office of the hotel, and presently defendant came out of the dining-room; that defendant said something to deceased, which was not understood by the witnesses, but the deceased did not answer; that defendant turned to some other parties present and said, 'He (meaning deceased) will not talk to me'; that one of the parties addressed said to defendant, 'Talk Cherokee to him'; that the deceased then said, 'He has got too damn much nigger blood in him to talk anything with any sense'; that defendant then kicked at deceased, hitting him lightly on the lower part of the leg; that immediately deceased sprang at defendant, striking him with a knife and cutting him in two places on the face; that after deceased began cutting defendant the

latter drew his pistol and fired, shooting deceased through the body; that at the time the defendant fired the two men were in striking distance of one another. The shot struck deceased in the right arm, near the elbow, and ranged through the body from right to left side; that when shot was fired deceased ran, and when defendant turned round the blood was streaming from his face, where he had been cut by deceased, and he said to the bystanders to go for a doctor, that he was killed; that a short time after the difficulty the knife used by deceased on defendant was found near the place where the trouble occurred; that a knife was also found on the person of deceased after his death.

"The testimony on the part of the defence tended to show that on the day of the difficulty defendant came into town from his home, about twenty miles distant, with his wife to do some shopping; that he brought his pistol with him and left it 'at the livery stable where he put up his team, and at supper time went by the stable and got his pistol, fearing that it might be stolen; that defendant did not have anything to say to deceased in the dining-room, but was talking with the father of the deceased, and that defendant was not intoxicated; that when defendant came out in the office deceased used the language indicated in the statement for the government, or words to that effect, and defendant kicked at him and probably struck him lightly; that when defendant kicked he stepped back and leaned up against the counter and deceased sprang at him and began cutting him with a knife; that deceased cut him in the face and kept on striking at him with the knife, and after he was cut in the face defendant drew his pistol and fired at deceased, who was in the act of striking him again with the knife. The foregoing is in substance the statement of the defendant who testified in his own behalf.

"Proof was also offered tending to show that the reputation of the deceased as a dangerous and lawless man was bad; that the reputation of the defendant as a peaceable and law-abiding man was good, and that the reputation of prosecuting witness Thomas Boseman was bad for truth in the communities where he had resided."

The court delivered an oral charge, occupying twenty-seven pages of the printed record, and embracing a discussion of most of the leading principles in criminal law, as well as many extracts from adjudged cases and elementary treatises.

Referring to the law of self-defence, the court said to the jury:

"A man might be to some extent in the wrong, and yet he might avail himself of the law of self-defence, but what is meant by his being in the lawful pursuit of his business means that he is not himself attempting to kill, or that he is not doing an act which may directly and immediately produce a deadly affray between himself and his adversary. He is not allowed to do either. The only time when he can do an act of that kind is when the condition exists which gives him the right to invoke this law. I say if he is attempting directly to kill, he is not in the lawful pursuit of his business unless it is in his own defence under this law; and when he is doing a wrongful act which immediately contributes to the result — brings into existence an affray in which violence may be used by the adversary and he may kill because of that violence — when that is the case, the law says he is so far the author of that violent condition as that he cannot invoke this law of self-defence, and it depends upon the circumstances and conditions of the case whether or not he can invoke the law so far as to have his crime mitigated from murder to manslaughter. Then, when he is in the lawful pursuit of his business — that is, when he is occupying the relation to the state of case where the killing occurred which I have named — and then is attacked by another under circumstances which denote an intention to take away his life or to do him some enormous bodily harm, he may lawfully kill the assailant, provided he use all the means in his power otherwise to save his own life or prevent the intended harm, such as retreating as far as he can or disabling his adversary without killing him, if it be in his power. Now, let us go over that again and see what these propositions are. He must be measurably in the right — and I have defined to you what that means — and when he is so situated he is attacked, in this case, by Frank Bozeman, the man who

was killed, and attacked under circumstances which denoted an intention to take away his life or to do him some enormous bodily harm, he may lawfully kill the assailant, provided he use all the means in his power otherwise to save his own life or prevent the intended harm, such as retreating as far as he can or disabling his adversary without killing him, if it be in his power. This proposition implies that he is measurably in the right. If he is doing any of these things which I will give you after awhile, which deprive him of the law of self-defence because of his own conduct in precipitating a conflict in which he kills, then he is not in the right; he is not doing what he had a right to do, and this proposition of the law of self-defence would not avail him; he could not resort to it, because his own conduct puts him in an attitude where, in the eye of the law, he is by his own wrong the creator of the necessity under which he acts, and he cannot invoke that necessity. The necessity must be one created by the man slain and which was not brought into existence by the direct act of the defendant contributing to that necessity."

After saying that both the accused and the deceased were upon the same plane in respect of the place or house in which they were at the time, each having the right to be there, the court proceeded: "Neither one of them was required to retreat under such circumstances, because the hotel or temporary stopping place of a man may be regarded as his dwelling place, and the law of retreat in a case like that is different from what it would be on the outside. Still, situated as was the defendant and as was the deceased, there was a rule incumbent upon both of them which required that they should use all reasonable means to avoid the condition which led to a deadly conflict, whether that means could have been avoided by keeping out of the affray or by not going into it or by stepping to one side; and this law says again that if a man is in the right, if he stands without being the creator of that condition and that condition is created by the man whom he kills, and the man is doing that in the shape of exercising an act of violence which may destroy his life or inflict great injury upon his person, yet if he could have paralyzed that

arm, if he could have turned aside that danger by an act of less deadly character than the one he did exercise, the law says he must do that. If he could have inflicted a less dangerous wound upon the man under the circumstances the law commands him to do that, because when he is doing that he is accomplishing the only purpose the law of self-defence contemplates he has right to accomplish — that is, to protect himself and not to execute vengeance, not to recklessly, wantonly and wickedly destroy human life, but to protect his own life when he is in the right and the other party is in the wrong."

*Mr. Benjamin T. Duval* and *Mr. William F. Cravens* for plaintiff in error.

*Mr. Assistant Attorney General Dickinson* for defendants in error.

I. The court properly charged that malice must be gathered, as an inference of law, from facts and circumstances proved. It was correct in saying that a man is presumed to intend the natural and probable consequence of his voluntary acts. *Clarion Bank* v. *Jones*, 21 Wall. 337; *Commonwealth* v. *York*, 9 Met. (Mass.) 93, 103; *Commonwealth* v. *Webster*, 5 Cush. 295, 305; *People* v. *Potter*, 5 Michigan, 1, 8; *People* v. *Scott*, 6 Michigan, 287, 296; *United States* v. *Taintor*, 11 Blatchford, 374, 375.

II. The portion of the charge which relates to the right to kill in self-defence when necessary is criticised on two grounds.

(*a*) It is said that the proof tended to show that defendant had retreated and had declined further contest, and that the above portion of the charge is erroneous because it does not recognize the right of self-defence on the part of one who has begun an affray, has in good faith retired from it, and has thus manifested his purpose, and after that is assailed by his adversary.

This portion of the charge was not upon the particular facts of this case, or upon the theory of either the government or

the defence. It was a general declaration of the law of self-defence, confined to a state of facts where the one who does a wrongful act "which immediately contributes to the result" kills his adversary who followed up this act with an attack.

There was no error in what the court said.

Self-defence is no excuse for a homicide if the accused brought on the difficulty and was himself the aggressor. 1 Hale, P. C., 482. *Gibson* v. *State*, 89 Alabama, 121; *People* v. *Robertson*, 67 California, 646; *Kinney* v. *People*, 108 Illinois, 519; *State* v. *Neeley*, 20 Iowa, 108; *State* v. *Murdy*, 81 Iowa, 603; *State* v. *Scott*, 41 Minnesota, 365; *Allen* v. *State*, 66 Mississippi, 385; *State* v. *Brittain*, 89 N. C. 481; *Stewart* v. *State*, 1 Ohio St. 66; *Stoffer* v. *State*, 15 Ohio St. 47; *State* v. *Hawkins*, 18 Oregon, 476.

This part of the charge had no application to the case of withdrawal from combat assumed in the brief and which is the foundation of the criticism. If the judge did not charge sufficiently, or at all, on that theory, he should have been so requested. No request was preferred.

Therefore, if he charged the law of self-defence correctly as far as he went, the case should not be reversed because he did not extend the charge to a particular theory advanced by defendant. This theory rests on the narrowest of grounds.

There was nothing in the proof for defendant tending to disprove the evidence for the government which tended to show that after they came out of the dining-room defendant accosted deceased. The evidence for the defendant tended to show that immediately after the remark of deceased, which followed this accosting, defendant kicked deceased, and stepped back and leaned up against the counter, and deceased sprang at him, cutting him with a knife, and then defendant shot him. There was no evidence here tending to show a retirement from the affray. The whole tragedy was in one act. There is nothing to indicate any interval.

Even if there be any grounds for saying that this evidence might have indicated such a purpose, it is so slight that the judge ought not to be put in error for not charging upon that aspect of the right of self-defence without a special request.

Counsel for defendant were not asleep when the charge was given. They must have been very alert, for they took fifty exceptions.

The record may present sufficient facts to warrant a renewal, if such an instruction had been asked and declined; but the judge should not now be put in error for such cause. The facts which the proof tended to show do not approach what is required to predicate a theory of withdrawal. There must be a withdrawal in good faith, and it must be such as to show the adversary that it is not desired to continue the conflict. The adversary must pursue him. *Parker* v. *State*, 88 Alabama, 4; *People* v. *Wong Ah Teak*, 63 California, 544; *Hittner* v. *State*, 19 Indiana, 48; *State* v. *Dillon*, 74 Iowa, 653; *Brazzil* v. *State*, 28 Tex. App. 584.

Here there was no retreat, no withdrawal, no pursuit. Can it be that a man can strike another, merely step back and stand his ground, and, when the party assailed strikes back with a deadly weapon, or attempts to shoot, kill him and go free on the plea of self-defence!

(b) That portion of the extract from the charge is assailed which says: "Provided he use all means in his power otherwise to save his own life or prevent the intended harm, such as retreating as far as he can, or disabling his adversary without killing him, if it be in his power." It is said that "defendant could not have retreated farther than he did, and the fierceness of the attack made it impossible to save his life by other means than by slaying his adversary."

What the judge said in this extract about retreating was in the way of a general disquisition. When he came to consider defendant's rights he plainly said that he, being a guest of the hotel, was not bound to retreat at all, as follows: "Upon the question of retreating as far as he can, there is a law which says that if a man is in his dwelling house he need not retreat; and that the hotel where defendant was lodging as a guest or was about to lodge — was there for his supper anyway — and where the other man was, put them both upon the same plane. Neither one of them was required to retreat under such circumstances, because the hotel or temporary stopping place of

a man may be regarded as his dwelling place, and the law of retreat in a case like that is different from what it would be on the outside."

Mr. Justice Harlan, after stating the case as above reported, delivered the opinion of the court.

We think that these portions of the charge (to which the accused duly excepted) were well calculated to mislead the jury. They expressed an erroneous view of the law of self-defence. The duty of the jury was to consider the case in the light of all the facts. The evidence on behalf of the government tended to show that the accused sought a difficulty with some one; that on behalf of the accused, would not justify any such conclusion, but rather that he had the reputation of being a peaceable and law-abiding man. But the evidence on both sides was to the effect that the deceased used language of an offensive character for the purpose of provoking a difficulty with the accused, or of subjecting him to the indignity of a personal insult. The offensive words did not, it is true, legally justify the accused in what he did — the evidence of the government tending to show that "he kicked at deceased, hitting him lightly on the lower part of the leg"; that on the part of the accused tending to show that he "kicked at" the deceased and "probably struck him lightly." According to the evidence of the defence, the accused then "stepped back, and leaned up against the counter," indicating thereby, it may be, that he neither desired nor intended to pursue the matter further. If the jury believed the evidence on behalf of the defence, they might reasonably have inferred from the actions of the accused that he did not intend to make a violent or dangerous personal assault upon the deceased, but only, by kicking at him or kicking him lightly, to express his indignation at the offensive language of the deceased. It should have been submitted to the jury whether the act of the accused in stepping back and leaning against the counter, not in an attitude for personal conflict, was intended to be, and should have been reasonably

interpreted as being, a withdrawal by the accused in good faith from further controversy with the deceased. On the contrary, the court, in effect, said that if, because of words used by the deceased, the accused kicked at or kicked the deceased, however lightly, and no matter how offensive those words were, he put himself in a position to make the killing manslaughter, even if the taking of life became, by reason of the suddenness, rapidity and fierceness of the assault of the deceased, absolutely necessary to save his own. By numerous quotations from adjudged cases, the court, by every form of expression, pressed upon the jury the proposition that "a person who has slain another cannot urge in justification of the killing a necessity produced by his own unlawful and wrongful acts." But that abstract principle has no application to this case, if it be true — as the evidence on behalf of the defence tended to show — that the first real provocation came from the deceased when he used towards the accused language of an offensive character, and that the accused immediately after kicking at or lightly kicking the deceased, signified by his conduct that he no longer desired controversy with his adversary; whereupon the deceased, despite the efforts of the accused to retire from further contest, sprang at the latter, with knife in hand, for the purpose of taking life, and would most probably have accomplished that object, if the accused had not fired at the moment he did. Under such circumstances, did the law require that the accused should stand still, and permit himself to be cut to pieces, under the penalty that if he met the unlawful attack upon him and saved his own life, by taking that of his assailant, he would be guilty of manslaughter? We think not.

If a person, under the provocation of offensive language, assaults the speaker personally, but in such a way as to show that there is no intention to do him serious bodily harm, and then retires under such circumstances as show that he does not intend to do anything more, but in good faith withdraws from further contest, his right of self-defence is restored when the person assaulted, in violation of law, pursues him with a deadly weapon and seeks to take his life or do him great

bodily harm. In *Parker* v. *The State*, 88 Alabama, 4, 7, the court, after adverting to the general rule that the aggressor cannot be heard to urge in his justification a necessity for the killing which was produced by his own wrongful act, said: "This rule, however, is not of absolute and universal application. An exception to it exists in cases where, although the defendant originally provoked the conflict, he withdraws from it in good faith, and clearly announces his desire for peace. If he be pursued after this, his right of self-defence, though once lost, revives. 'Of course,' says Mr. Wharton, in referring to this modification of the rule, 'there must be a real and *bona fide* surrender and withdrawal on his part; for, if there be not, then he will continue to be regarded as the aggressor.' 1 Wharton's Cr. Law, (9th ed.) § 486. The meaning of the principle is that the law will always leave the original aggressor an opportunity to repent before he takes the life of his adversary. Bishop's Cr. Law, (7th ed.) § 871." Recognizing this exception to be a just one, the court properly said, in addition: "Due caution must be observed by courts and juries in its application, as it involves a principle which is very liable to abuse. The question of the good or bad faith of the retreating party is of the utmost importance, and should generally be submitted to the jury in connection with the fact of retreat itself, especially where there is any room for conflicting inferences on this point from the evidence." Both parties to a mutual combat are wrong-doers, and the law of self-defence cannot be invoked by either, so long as he continues in the combat. But, as said by the Supreme Court of Iowa in *State* v. *Dillon*, 74 Iowa, 653, 659, if one " actually and in good faith withdraws from the combat, he ceases to be a wrong-doer; and if his adversary have reasonable ground for holding that he has so withdrawn, it is sufficient, even though the fact is not clearly evinced." See also 1 Bishop's New Crim. Law, § 702; *People* v. *Robertson*, 67 California, 646, 650; *Stoffer's case*, 15 Ohio St. 47. In Wharton on Homicide, § 483, the author says that "though the defendant may have thus provoked the conflict, yet, if he withdrew from it in good faith and clearly announced his

desire for peace, then, if he be pursued, his rights of self-defence revive."

We do not mean to say that the jury ought to have found that the accused, after kicking the deceased lightly, withdrew in good faith from further contest and that his conduct should have been so interpreted. It was for the jury to say whether the withdrawal was in good faith, or was a mere device by the accused to obtain some advantage of his adversary. But we are of opinion that, under the circumstances, they might have found that the accused, although in the wrong when he kicked or kicked at the deceased, did not provoke the fierce attack made upon him by the latter, with knife in hand, in any sense that would deprive him altogether of the right of self-defence against such attack. If the accused did, in fact, withdraw from the combat, and intended so to do, and if his conduct should have been reasonably so interpreted by the deceased, then the assault of the latter with a deadly weapon, with the intent to take the life of the accused or to do him great bodily harm, entitled the latter to the benefit of the principle announced in *Beard* v. *United States*, 158 U. S. 550, 564, in which case it was said: "The defendant was where he had a right to be when the deceased advanced upon him in a threatening manner and with a deadly weapon; and if the accused did not provoke the assault, and had at the time reasonable grounds to believe, and in good faith believed, that the deceased intended to take his life or to do him great bodily harm, he was not obliged to retreat, nor to consider whether he could safely retreat, but was entitled to stand his ground and meet any attack made upon him with a deadly weapon, in such a way and with such force as, under all the circumstances, he, at the moment, honestly believed, and had reasonable grounds to believe, was necessary to save his own life or to protect himself from great bodily injury."

The charge, as above quoted, is liable to other objections. The court said that both the accused and the deceased had a right to be in the hotel, and that the law of retreat in a case like that is different from what it would be if they had been on the outside. Still, the court said that, under the circum-

stances, both parties were under a duty to use all reasonable means to avoid a collision that would lead to a deadly conflict, such as keeping out of the affray, or by not going into it, or "by stepping to one side"; and if the accused could have saved his life, or protected himself against great bodily harm, by inflicting a less dangerous wound than he did upon his assailant, or "if he could have paralyzed that arm," without doing more serious injury, the law commanded him to do so. In other words, according to the theory of the charge, although the deceased sprang at the accused, with knife in hand, for the purpose of cutting him to pieces, yet if the accused could have stepped aside or paralyzed the arm of his assailant, his killing the latter was not in the exercise of the right of self-defence. The accused was where he had the right to be, and the law did not require him to step aside when his assailant was rapidly advancing upon him with a deadly weapon. The danger in which the accused was, or believed himself to be, at the moment he fired is to some extent indicated by the fact, proved by the government, that immediately after he disabled his assailant (who had two knives upon his person) he said that he, the accused, was himself mortally wounded and wished a physician to be called. The accused was entitled, so far as his right to resist the attack was concerned, to remain where he was, and to do whatever was necessary or what he had reasonable grounds to believe at the time was necessary, to save his life or to protect himself from great bodily harm. And under the circumstances, it was error to make the case depend in whole or in part upon the inquiry whether the accused could, by stepping aside, have avoided the attack, or could have so carefully aimed his pistol as to paralyze the arm of his assailant without more seriously wounding him.

Without referring to other errors alleged to have been committed, the judgment below is reversed and the case is remanded for a new trial.

*Reversed.*

MR. JUSTICE BROWN and MR. JUSTICE PECKHAM dissented.