THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BILLY B. TUCKER, Defendant-Appellant.

Second District   No. 2—87—0856

Opinion filed November 3, 1988.—Rehearing denied December 12, 1988.

Robinson & Skelnik, of Elgin (Josette Skelnik, of counsel), for appellant.

Dallas C. Ingemunson, State's Attorney, of Yorkville (William L. Browers and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Billy B. Tucker, was charged in the circuit court of Kendall County with the murder of Kevin Neuman (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2)) following a shooting at T's Tap, a tavern, in Plano, Illinois. The jury was instructed as to the offenses of murder and involuntary manslaughter and on the defendant's the-

ory of self-defense. The defendant refused a voluntary manslaughter instruction. It found the defendant guilty of murder. Defendant was sentenced to 30 years' imprisonment.

The defendant raises these issues on appeal: (1) whether the State proved beyond a reasonable doubt that he was not acting in self-defense at the time of the shooting; (2) whether the jury was instructed correctly on the law of self-defense; (3) whether he was denied a fair trial due to the admission of improper other crimes evidence; and (4) whether he was denied a fair trial due to a private conversation between an assistant State's Attorney and a State witness which occurred in the presence and within the hearing of the jury.

On the evening of November 9, 1986, the defendant was sitting at the bar in T's Tap next to Hoyett Cantrell and Bruce Batchelor. Also sitting at the bar were Kevin Neuman and his girlfriend, Sandy Coffman, Brent Martin, Mike Hansen, and Jerry Smith. John Parrott was playing darts. Louise "Sue" Russell was tending bar.

When the defendant made a comment to Parrott, whom he thought was acting "goofy," Hansen told the defendant to leave Parrott alone. Further comments were then exchanged between the defendant and Hansen and the defendant and Kevin Neuman, and the defendant told Neuman that if he wanted to "whip [his] ass, [he could] come over and try." Neuman then went to the door and asked the defendant if he was coming outside. Neuman, Martin, Hansen, Parrott and the defendant then left the bar. Before leaving, however, the defendant retrieved a gun he had given to Hoyett Cantrell to hold for Eddie Smith. Smith, who had previously been barred from T's Tap, gave the gun to the defendant earlier that evening when the bartender had noticed Smith and called the police to have him removed from the bar. The defendant carried the gun around with him the rest of the evening until he gave it to Hoyett Cantrell just prior to the confrontation with Neuman.

Outside, according to John Parrott, the defendant and Neuman pushed each other. Defendant then stepped back and drew a gun out of his waistband. Bruce Batchelor, looking out the window, also saw the defendant pull out the gun. Brent Martin testified the defendant pointed the gun up, cocked it, and pointed it back down. Mike Hansen came back into the bar and notified the bartender to call the police because the defendant had a gun. Words were exchanged between the defendant and Neuman. Martin testified Neuman put up his hands and said, "Forget about it. Let's go back inside and I'll buy you a beer." Parrott similarly testified that Neuman said, "I

can't fight with that," and the men went back into the bar.

The defendant's testimony was that Neuman grabbed him when he got to the door and that he jerked away from Neuman and shoved him. Brent Martin stepped behind the defendant, and the defendant told Neuman he was not going to fight him and all his buddies, too. When Neuman advanced on him, the defendant testified he pulled out the gun and said he was not going to fight Neuman. The defendant testified Neuman suggested he put the gun away, and he would send his friends back inside and then he would "whoop" him. Defendant told Neuman he knew of Neuman's reputation and was not going to fight him. Neuman again suggested the defendant put the gun down, and the defendant refused. When Neuman asked if the defendant was going to talk all night or was going to fight, the defendant stated he would do neither and told Neuman to stay away from him. The defendant stated he knew about "the man" (referring to Neuman) and was scared of him. When asked what he knew of Neuman's reputation, the defendant testified, "If Kevin Neuman gets you down, he'll hurt you. He'll stomp you. He'll beat you. Anything Kevin Neuman can do to you, he'll do it." The State's objection to this as being nonresponsive to the question was sustained, and the answer stricken.

Defendant testified Neuman then told him, "Well, you know, Tucker, I can't back down," and the defendant said, "Man, you ain't backing down. It's no backing down to it." Defendant told Neuman all he wanted to do was go back inside and get his keys and stuff and leave. The defendant testified Neuman agreed to this and told the defendant to go inside, suggesting that he put the gun away and go in first. The defendant testified he said no, he would not put the gun away, and suggested instead that Neuman and his friends go in first and he would come in after them and get his keys and stuff and leave. Neuman then said, "Okay, no problem," and the defendant said, "Hey man, you do this, I'll buy you a beer next time I see you."

Testimony conflicted as to whether the defendant preceded or followed Neuman back inside. It appears that defendant was the last one to reenter the bar, but that he then walked past Neuman when Neuman hesitated upon entering. The defendant then proceeded to walk toward his bar stool. Testimony also conflicted as to whether Neuman said anything to the defendant to attract his attention and cause him to turn around. Bruce Batchelor testified the defendant just turned around and shot Neuman. Hoyett Cantrell figured Neuman "kind of hollered" because he caught the defendant's atten-

tion. The defendant's testimony was that he heard a noise and then turned around.

Whether Neuman made a noise or not, it is clear from the record that he was making a move toward the defendant as the defendant turned around. Sandra Coffman, Neuman's girlfriend, testified Neuman gave her a "real serious look" just before he grabbed, or grabbed for, the defendant and was shot. John Parrott testified that when the defendant turned around, Neuman was "diving for him." Hansen testified Neuman followed the defendant as the defendant walked to his bar stool and that Neuman's hands were "kind of extended some." Hoyett Cantrell said Neuman "kind of lunged after" the defendant; Neuman was not in a football stance, but was down a little lower "like he was going to take off after the defendant." Bruce Batchelor testified that after the first shot, Neuman "kept moving toward the defendant" and that Neuman's arms were out to the side with his elbows at about a 45-degree angle to the floor. The defendant testified that when he turned around, he saw Neuman coming at him with his arms up. The defendant testified he still had the gun "right there" and that Neuman knew that he had it. All the defendant remembered was Neuman "up and coming down at him" hearing the gun go "bang," and something else hit him. He did not recall anything after that until the ambulance arrived.

After the first shot, Bruce Batchelor testified he heard Neuman say, "Oh, damn it, he shot me in the heart." Hoyett Cantrell heard Neuman say, "I have been shot." According to the record, the first shot entered Neuman's stomach area, and he could have survived with medical attention.

Brent Martin testified the defendant and Neuman were right next to each other when the second shot was fired. That shot entered Neuman's chest area, pierced the aorta, and caused Neuman's death. According to Martin, after the first shot, Neuman raised his arms up to the defendant, "because his legs buckled or something." Parrott said that after the first shot, the two men started falling back. Hansen testified Neuman "lunged" at the defendant after the first shot, and a second shot went off. Hoyett Cantrell testified Neuman's right hand, which was empty, "came up on top" of the defendant, and the defendant brought the gun up, shot Neuman in the chest, and the two men fell on the floor.

A third shot, which did not strike anyone, was discharged when Brent Martin was beating on the defendant's hand trying to remove the gun. Martin admitted he hit the defendant in the face while the defendant was on the floor, and Mike Hansen admitted he kicked the

defendant in the shoulder while the defendant was down on the floor.

When the paramedics arrived on the scene, both men were on the floor, and Neuman was lying partially on top of the defendant. Neuman's right hand up to about his wrist was underneath the defendant's back; his left arm was draped across defendant's leg. There was blood on the floor and on the two men; neither man was moving, and Neuman had no pulse. There were abrasions and contusions on the defendant's face. Both men were carried out on stretchers. The defendant's keys, cigarettes and lighter were later found on the bar near where he had been sitting.

There was evidence the defendant was 45 years old, was 6 feet 1 or 1½ inches tall and weighed between 140 and 145 pounds. Kevin Neuman was 25 years old, 5 feet 9 inches tall and weighed approximately 180 pounds. He was well-built and had average or better than average sized arms. Todd Wells, one of the paramedics who responded to the call to T's Tap, testified he lifted weights with Neuman two or three years earlier, and Neuman could bench-press 200 pounds. Bruce Batchelor testified he "palled around" and lifted weights with Neuman, and Neuman could bench-press about 300 pounds. He testified Neuman had a bad temper and got into a lot of fights. Another of the paramedics, Tim Waldrop, testified he was a friend of Neuman's and knew Neuman had been in fights before and was a weightlifter.

Plano police sergeant Harry Haggard testified he was familiar with Neuman's reputation in the community and that he was "one of our local tough guys" with a reputation for being a fighter. Plano police officer Lawrence Stefanski testified to an incident in November 1985 when he arrested Neuman for driving under the influence of alcohol. Neuman kicked and hit his car, was verbally abusive, and refused to cooperate with a personal belongings inventory, fingerprints or photographs. It took two officers to place Neuman, struggling and kicking, in a cell.

Twenty-eight-year-old Kent Anders, a former Marine, testified to an incident at the Plano recreation center in 1983 when Neuman, also a former Marine, attempted to engage Anders in conversation. Anders did not know Neuman and would not talk with him. Later, Neuman confronted Anders and Anders' brother outside the center, saying he was in the "recon" division of the Marines and that the group of people behind him offered him $50 "if [he] kicked both of [their] asses." Anders explained that the reconnaissance division was an elite infantry of the Marines who were trained to kill with their bare hands. Anders' glasses were then knocked off and a beating

commenced upon him and his brother which lasted about 20 minutes. Based on an identification of Neuman by an onlooker, Michael Cross, as one of three persons who attacked them, Anders and his brother and family filed a lawsuit against Neuman and the other two men. Michael Cross testified at trial and corroborated that an argument took place between Anders and Neuman during which both men used profanity. Outside the center, Cross saw Anders and Neuman fighting and Anders' brother trying to break it up. More than one fight was going on in the crowd around the two men.

The jury found the defendant guilty of murder.

The defendant contends the State failed to prove beyond a reasonable doubt he was not acting in self-defense when he shot Kevin Neuman. Defendant points particularly to the facts that the events leading to the shooting placed him in reasonable apprehension for his safety; that Neuman reinitiated the fray after he retreated back inside the bar; that Neuman, though unarmed, was his physical superior and could have inflicted great bodily harm; that Neuman continued to go after the defendant even after he was shot once; that he suffered unexplained injuries during the shooting; and that Neuman had a propensity for violence and aggression.

The State contends its evidence clearly shows the defendant was not acting in self-defense when he shot Kevin Neuman where the evidence shows he voluntarily went outside to "face down" a man whom he allegedly feared and where there was evidence he was, in effect, spoiling for a fight because he was angry about the ongoing feud between Eddie Smith and Bruce Batchelor. As to this feud, there was evidence at trial that Eddie Smith's windows and tires had been damaged by Bruce Batchelor and that Smith retaliated by breaking Batchelor's windows on the evening when Neuman was shot. The defendant referred to Smith and Batchelor as having a "war" and told Batchelor shortly before the confrontation with Neuman occurred that he (Batchelor) and Smith "fight like two kids" and suggested to Batchelor, "Why don't you all go out and do it and get it done instead of including all your wife [sic] and kids in it."

Based on the record in this case and the law, we conclude the State's evidence proved beyond a reasonable doubt that the defendant was not acting in self-defense.

■ The justifiable use of force in defense of one's person is an affirmative defense. (Ill. Rev. Stat. 1987, ch. 38, pars. 7—1, 7—14.) Once the issue is raised, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. (Ill. Rev. Stat. 1987, ch. 38, par. 3—2; *People v. Johnson* (1988), 172 Ill. App. 3d

371, 377; *People v. Balfour* (1986), 148 Ill. App. 3d 215, 221.) The use of force in defense of one's person is justified where:

> "(1) that force is threatened against the person; (2) the person threatened is not the aggressor; (3) the danger of harm is imminent; (4) the force threatened is unlawful; and (5) the person threatened must actually believe that a danger exists, that the use of force is necessary and that such beliefs are reasonable. [Citations.]" *People v. Greene* (1987), 160 Ill. App. 3d 1089, 1095-96.

See also *People v. Alcazar* (1988), 173 Ill. App. 3d 344, 349.

A person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony. Ill. Rev. Stat. 1987, ch. 38, par. 7—1; *Alcazar*, 173 Ill. App. 3d at 349.

The use of force in defense of one's person is not available to a person who, *inter alia*, initially provokes the use of force against himself, unless "[s]uch force is so great that he reasonably believes that he is in imminent danger of death or great bodily harm, and that he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant," or "[i]n good faith, he withdraws from physical contact with the assailant and indicates clearly to the assailant that he desires to withdraw and terminate the use of force, but the assailant continues or resumes the use of force." (Ill. Rev. Stat. 1987, ch. 38, pars. 7—4(c)(1), (c)(2); *People v. Castiglione* (1986), 150 Ill. App. 3d 459.) Whether there was a justifiable use of force is an issue to be determined by the trier of fact, which must consider whether the State has negated beyond a reasonable doubt any one of the elements justifying the use of force. If the State has negated one of the elements, then the State has carried its burden of proof. (*Greene*, 160 Ill. App. 3d at 1096; *People v. Zolidis* (1983), 115 Ill. App. 3d 669, 674.) On review, the jury's verdict will not be disturbed unless the evidence is palpably contrary to the verdict or so unreasonable, improbable, or unsatisfactory that it justifies entertaining a reasonable doubt of the defendant's guilt. *People v. Sawyer* (1986), 115 Ill. 2d 184; *Johnson*, 172 Ill. App. 3d at 377.

■ Beginning about 5 p.m. on November 9, the defendant here was in five different drinking establishments. The defendant received the gun from Eddie Smith in the first of these, T's Tap. In each of the next four establishments over the next three or four hours, there

was evidence that the defendant handled or made reference in some manner to the gun he was carrying. Further, although intoxication was not an issue, there was evidence the defendant was drinking alcoholic beverages that evening and that Kevin Neuman's blood-alcohol concentration after his death was .25, more than twice the concentration at which one is presumed to be legally intoxicated.

Considering the circumstances of the actual confrontation in the bar, in addition to the likelihood the defendant was substantially emboldened by alcohol and his awareness of the accessibility of the gun, it is clear it was he who initially provoked the use of force against himself. Before any interchange at all occurred with Neuman, the defendant made provoking comments to Parrott and Hansen and told Martin to shut up. He then invited Neuman to try to "whip his ass" when Neuman told him to shut up also. "[M]ere words are sufficient to render one who later kills another to be an aggressor." (*People v. Crue* (1977), 47 Ill. App. 3d 771, 774 (Green, P.J., specially concurring).) The defendant's behavior belies his assertion he was in reasonable apprehension of his safety and was afraid of Neuman because he knew of his reputation. The only testimony given by the defendant concerning his knowledge of Neuman's reputation was stricken as being nonresponsive to the question. Consequently, there is no evidence in the record concerning the defendant's knowledge of Neuman's reputation which would support his subjective belief, reasonable or otherwise, that he was justified in using force against Neuman that was intended or likely to cause death or great bodily harm. See *People v. Johnson* (1988), 172 Ill. App. 3d 371, 377-78.

In the alternative, the defendant's initiation of the provoking comments in the bar and his show of fearlessness in the bar suggest he intended to use the force which occurred in response to his provocation as an excuse to use the gun. Such an intent negates the defense of self-defense. (See Ill. Rev. Stat. 1987, ch. 38, par. 7—4(b).) Clearly the defendant could not have been surprised by the show of force from Neuman and his friends in response to his goading comments. The fact he armed himself before going outside shows that he fully expected the show of force.

The instant cause is readily distinguishable from *In re S.M.* (1981), 93 Ill. App. 3d 105, cited by the defendant in support of his position he took the gun for protection, not aggression. In *S.M.*, the court found it was reasonable for the respondent, a 14-year-old boy, to produce and repeatedly fire a gun upon being surrounded, confronted and chased by four older, unarmed teenagers. The respondent there, however, was carrying the gun on his way to go hunting

raccoons *before* he ever engaged in any confrontation with the four older teenagers. In a situation where the aggressor has provoked the use of force against himself as an excuse for retaliation as set forth in section 7—4 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 7—4(b)), no right of retreat is permitted short of a complete withdrawal such that the victim's subsequent use of force initiates a new conflict. "[I]f the situation is such that either the aggressor or the victim must suffer harm or even death, the victim clearly is the one who is entitled to such protection as the law affords." Ill. Ann. Stat., ch. 38, par. 7—4, Committee Comments—1961, at 410 (Smith-Hurd 1972).

The defendant's purported withdrawal here was not complete where he refused to disarm himself, and Neuman's lunge toward him inside the bar was not a new conflict; it was a continuation of the one set in motion by the defendant.

Assuming, *arguendo*, the defendant did not intend to provoke force against himself as an excuse for retaliation, an aggressor who otherwise initially provokes the use of force against himself may not avail himself of the defense of self-defense except under one of the two exceptions set forth in section 7—4 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, pars. 7—4(c)(1), (c)(2)), as noted above. The evidence negated both of these exceptions.

As to the first of these exceptions, the defendant did not "exhaust every reasonable means to escape such danger." He passed up a very clear, very simple opportunity to escape the threat posed by Neuman and his friends. He could have refused to go outside and face Neuman. Neuman, in fact, asked the defendant if he was "coming or not." Rather than saying "not," the defendant armed himself and went outside.

As to the second exception, once outside, Neuman grabbed the defendant, and the defendant jerked away and shoved Neuman. Rather than withdrawing in good faith and announcing an intention to terminate the use of force at that point, the defendant drew the gun, thus escalating the force employed, and he refused to put the gun away even once he was back inside the bar. The defendant admitted he had the gun "right there" when he turned around and heard the gun go "bang," striking Neuman in the stomach area.

Based on the evidence, the jury reasonably could have concluded either that the defendant's withdrawal was not complete, that he did not exhaust every reasonable means to escape danger or that his withdrawal was not in good faith and, thus, his use of force against Kevin Neuman was not justified.

The defendant next contends the jury was incorrectly instructed on the law of self-defense where it received only the first paragraph of Illinois Pattern Jury Instruction No. 24—25.09 and not the second. (Illinois Pattern Jury Instructions, Criminal, No. 24—25.09 (2d ed. 1981) (hereinafter IPI Criminal 2d).) That instruction in full provides:

"A person who initially provokes the use of force against himself is justified in the use of force only if

■ the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person;

or

■ he in good faith withdraws from physical contact with the other person and indicates clearly to the other person that he desires to withdraw and terminate the use of force, but the other person continues or resumes the use of force." IPI Criminal 2d. No. 24—25.09.

Defendant acknowledges that he made only a general objection to the instruction at trial and did not ask that the jury be instructed as to the second paragraph. The defendant's post-trial motion did not specify the instruction was erroneous. Defendant contends, however, that the error was grave, and it should be considered plain error where there was evidence which, if believed by the jury, established that he withdrew from the conflict, Neuman reinitiated it, and, therefore, he was fully restored to his right of self-defense and was justified in using deadly force against Neuman.

The State argues there was no evidence which would have supported the giving of the second paragraph of the instruction, the defendant waived the issue by failing to tender the instruction, and no plain error is evident. We agree.

■ Generally, a defendant waives any error in the instruction to the jury if he does not object or proffer alternative instructions (*People v. Reddick* (1988), 123 Ill. 2d 184, 198), and, further, issues not properly raised in defendant's post-trial motion will not be considered on appeal (*People v. Thurman* (1984), 104 Ill. 2d 326, 329; *People v. Smith* (1986), 149 Ill. App. 3d 145, 153-54)). Supreme Court Rule 451 provides, however, that substantial defects in instructions are not waived by the failure to make timely objections thereto if the interests of justice require. (107 Ill. 2d R. 451(c); *People v. Clevenger* (1985), 130 Ill. App. 3d 1087.) Certain instructions, such as the elements of the offense charged, the presumption of innocence, and the

burden of proof are essential to a fair jury trial and must be given (*People v. Parks* (1976), 65 Ill. 2d 132, 137); if they are not, the concept of waiver will not be employed to bar reversal. (*People v. Lowe* (1987), 152 Ill. App. 3d 508, 511.) The failure to provide essential jury instructions deprives the accused of a fair trial. *People v. Pegram* (1987), 152 Ill. App. 3d 656, 660.

■ The instruction at issue here is not one of these "essential" jury instructions, as in *People v. Thurman* (1984), 104 Ill. 2d 326, and *People v. Clevenger* (1985), 130 Ill. App. 3d 1087, cited by the defendant, where it was found to be plain error not to instruct the jury that the State bore the burden of proving beyond a reasonable doubt the absence of justification. (See also *People v. Reddick* (1988), 123 Ill. 2d 184, 201-02.) Rather, it is an optional subparagraph, the use of which depends on whether it is "applicable." (See IPI Criminal 2d No. 24—25.09, Committee Note.) In response to the State's argument there was insufficient evidence that the defendant withdrew, the defendant argues the question of whether he withdrew in good faith or not is a matter for the jury to decide. (*Rowe v. United States* (1896), 164 U.S. 546, 41 L. Ed. 547, 17 S. Ct. 172.) The *Rowe* court said, however, that the question should be submitted to the jury "in connection with the fact of retreat itself" (*Rowe,* 164 U.S. at 556, 41 L. Ed. at 551, 17 S. Ct. at 175), thus implying there was sufficient evidence of such retreat in the first place to warrant the question of whether it was in good faith or not.

Here, there is clear evidence to the contrary with regard to the second aspect of a complete withdrawal; that is, that the defendant desired to withdraw *and* terminate the use of force inasmuch as he refused to put down the gun. (IPI Criminal 2d No. 24—25.09(2); Ill. Rev. Stat. 1987, ch. 38, par. 7—4(c)(2).) Moreover, in the revised comments of the committee which drafted the withdrawal exception to an initial aggressor's justifiable use of force, Professor Charles H. Bowman states:

> "The second situation is that in which the aggressor in good faith withdraws from the conflict and effectively communicates to the victim his intention to withdraw, but the victim continues or resumes the conflict: the condition then should be regarded as reversed, the initial aggressor becoming the victim. *This second situation applies only to the use of non-deadly force in self-defense.*" (Emphasis added.) Ill. Ann. Stat., ch. 38, par. 7—4, Committee Comments—1961, at 410 (Smith-Hurd 1972).

The force used here by the defendant against Neuman, who pur-

portedly was now the aggressor, was deadly force. As such, the defendant's contention that the jury was improperly instructed is without merit.

The defendant contends it was error for the court to allow Bruce Batchelor to testify concerning an incident which occurred several hours prior to the shooting in question in which the defendant allegedly placed the gun he was carrying for Eddie Smith up against Batchelor's stomach. Batchelor and the defendant were at the Friendly Tap at the time, and they were talking about the "war" between Batchelor and Eddie Smith when the defendant told Batchelor he was going to "take care of the problem" and held the gun up against Batchelor's stomach. Batchelor testified the defendant "mellowed out a little bit" after that. At trial, the defendant denied this incident occurred.

Defendant contends the admission of this evidence was reversible error since it constituted evidence of other crimes for which no exception existed. The State argues the defendant waived the issue by failing to include it in his post-trial motion or, in the alternative, admission of the evidence was proper.

■ Although this evidence was the subject of a pretrial motion *in limine* and the defendant argued his objection to Batchelor's testimony at trial, this court has consistently held that an alleged error must be both objected to at trial and noted in the post-trial motion or it may be considered waived. (*People v. Howard* (1985), 139 Ill. App. 3d 755, 762.) Defendant cites no authority in support of his contention that the admission of Batchelor's testimony was plain error which should be reviewed by this court under Supreme Court Rule 615, thus also waiving his plain error argument under the provisions of Supreme Court Rule 341, which requires that citation to relevant authority be included with the party's contentions of error on appeal. 107 Ill. 2d R. 615(a); 113 Ill. 2d R. 341(e)(7).

■ On the merits, the general principles of law governing the admission of evidence of other offenses was recently set forth in *People v. Whitehead* (1988), 171 Ill. App. 3d 900, 907:

> "Evidence of other crimes is admissible if relevant to establish intent, absence of mistake, design, plan, identity, motive or *modus operandi.* [Citations.] *Evidence of other crimes may also be admitted if relevant to prove any material issue other than defendant's propensity to commit a crime.* [Citation.] The probative value of such evidence is weighed against its prejudical effect [citations], and the decision to admit such evidence will not be overturned absent an abuse of discretion. [Cita-

tions.]" (Emphasis added.)

See also *People v. Clark* (1988), 173 Ill. App. 3d 443, 453-54.

The defendant here made an issue of the fact that his introduction of the gun into the confrontation with Kevin Neuman was in self-defense rather than as an act of aggression. Batchelor's testimony that only a short time earlier that same evening the defendant pointed a gun at him and cast himself in the role of the one who would "take care of the problem" with the use of the gun was particularly relevant to the issue of whether his stated purpose in introducing the gun into the confrontation with Neuman was as an instrument of protection or as an instrument of aggression. (See *United States v. Fountain* (7th Cir. 1985), 768 F.2d 790 (where defendant had made an issue of his purpose in having knife with which he attacked prison guards, evidence that his previous use of knife in prison was for attack rather than defense was relevant to cast doubt on his stated purpose).) We conclude there was no error in the admission of this testimony.

The defendant's final contention is that he was denied a fair trial and an unbiased determination of his guilt or innocence as the result of a private conversation held between an assistant State's Attorney and State witness Bruce Batchelor in the presence and within the hearing of the jury.

During trial when the parties retired to chambers to argue the defendant's objection to Batchelor's testimony concerning the gun incident at the Friendly Tap, the State's Attorney was concerned about the fact Batchelor, who was easily intimidated according to the State's Attorney, was sitting in the witness stand facing the defendant. He sent his assistant back out into the courtroom to be with the witness. When defense counsel shortly thereafter went back into the courtroom to get something, he observed the witness and the assistant State's Attorney conversing in the presence of the jury still seated in the jury box. Back in chambers, he moved for a mistrial on the basis this tended to "humanize" the witness in front of the jury. The assistant State's Attorney was called into chambers, and she advised the court she was having a general conversation with the witness about a traffic accident he had and about his hair. She said she was about six inches away from the witness during this conversation, and she did not think the jury heard it. The court denied the defendant's motion for mistrial.

Defendant raised the issue in his post-trial motion, and testimony was presented at the hearing on the motion. Both the defendant and pastor Greg Freza, who had met the defendant while the defendant

was incarcerated and who was present during the defendant's trial, testified that during the assistant State's Attorney's conversation with Batchelor, the witness remarked that he was "scared." According to the defendant's testimony, the assistant State's Attorney responded that Batchelor did not have to be scared of "them" anymore. Defendant testified that during this conversation, the jurors were turned toward the assistant State's Attorney and Batchelor, listening. Pastor Freza stated that he was approximately 30 feet away from the witness stand and could hear about 70% of the conversation. Freza also remembered some discussion about a motorcycle accident, a scar on the witness' head and his haircut. Freza testified Batchelor's demeanor on the witness stand was very "fidgety," and Batchelor was a very nervous witness.

Defendant's trial counsel also testified with respect to the conversation. He recalled the defendant telling him at some point during trial about that portion of the conversation in which the assistant State's Attorney told Batchelor he did not have to be afraid "anymore." The assistant State's Attorney testified she talked with Batchelor about his haircut, his motorcycle accident, and whether he wanted some water. She did not recall saying anything to Batchelor about not having to be scared anymore.

Seventy-five-year-old bailiff Willard Brier also testified he faintly recalled the conversation. It was his opinion the jury was not listening to the conversation. He could not recall whether the closest juror to the witness at the time of the conversation was a man or a woman or anything about Batchelor's appearance. The clerk of the court, Fay Holl, called as the court's witness, testified she remembered the conversation about the motorcycle accident and about the witness' hair. She did not recall the portion of the conversation about him being scared. She could not say it did not take place, just that she did not remember. She did not observe the jury while this conversation was taking place.

Although the court did not approve of the conversation, it found that the conversation did not involve any of the issues or facts in the case, and it did not constitute error. Accordingly, the court denied the defendant's post-trial motion.

The defendant argues this conversation deprived him of a fair trial by an impartial jury. The record showed Batchelor was 6 feet 4 inches tall, weighed 360 pounds, had a bad temper, and that when he loses his temper, "everybody better look out." As such, in light of the conversation, the defendant contends the jury could readily have come to the conclusion that if Batchelor feared the defendant, then

the defendant must be a very dangerous person indeed. Defendant also contends the likelihood the jury was influenced by this conversation is enhanced by the haste with which the verdict was returned and the fact the jury inquired during its deliberations whether security would be provided for them when they were discharged.

■ It is true that a showing that highly prejudicial material not in evidence was considered by a jury during its deliberations may cause a new trial to be ordered. (*People v. Nuccio* (1973), 54 Ill. 2d 39, 48.) It is also true that "[p]arties, and other persons connected with a case or having some interest therein, including counsel, witnesses, and relatives of parties, should carefully avoid private conversations and social intercourse with jurors." (*People v. Kelly* (1975), 24 Ill. App. 3d 1018, 1033.) The rationale behind this caution is "to keep the jurors free from influences tending to prejudice them against or in favor of either party and is designed to maintain integrity of judicial procedure and impartial justice. [Citations.]" (*Kelly,* 24 Ill. App. 3d at 1033.) However, " '[i]n order to justify setting aside the verdict of a jury because of an unauthorized communication with them, it is necessary to show the defendant was prejudiced.' " *People v. Williams* (1967), 38 Ill. 2d 115, 126, quoting *People v. Berry* (1960), 18 Ill. 2d 453, 459; see also *People v. Harris* (1988), 123 Ill. 2d 113, 132.

■ The jury here returned its verdict in approximately two hours' time. This does not necessarily import "haste" in returning its verdict, and, as concluded above, the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt. As to the jury's request for security, the court's order denying defendant's post-trial motion recited that an inquiry made of the jurors revealed that the jury saw the defendant in different clothes in court each day and it was not aware that he was in custody. Further, defense counsel made reference to the fact of the friends and relatives of the defendant in the courtroom. It was the belief of the jurors that they, the defendant, his family and friends would all be leaving the courthouse at the same time in the unlighted parking areas after dark, and this made several of the jurors nervous.

None of the jurors were polled about whether they had heard the conversation between the assistant State's Attorney and Batchelor and, if so, what their recollection of it was. Further, it is not clear from the evidence at the post-trial hearing that what the witness was "scared" of was the defendant. Batchelor was a nervous witness and may have been "scared" of testifying.

The defendant's evidence as to the content of the allegedly preju-

dicial conversation is simply too speculative to warrant a new trial. Further, the content of the allegedly prejudicial conversation did not relate to the question of the defendant's guilt or innocence as was the case in *Parker v. Gladden* (1966), 385 U.S. 363, 17 L. Ed. 2d 420, 87 S. Ct. 468, cited by the defendant. Consequently, we conclude that the court did not abuse its discretion in denying defendant's motion for a new trial.

The judgment of the circuit court of Kendall County is affirmed.

Affirmed.

LINDBERG, P.J., and INGLIS, J., concur.