UNITED STATES, Appellee

v

CARL D. O'NEAL, Private, U. S. Army, Appellant

16 USCMA 33, 36 CMR 189

No. 18,838

February 18, 1966

*Captain Beverly B. Bates* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk* and *Lieutenant Colonel Jacob Hagopian.*

*Captain Joseph H. Crosby* argued the cause for Appellee, United States. With him on the brief were *Colonel Joseph J. Crimmins* and *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

QUINN, Chief Judge:

A general court-martial in Verdun, France, convicted the accused of stabbing Private First Class John E. Shrode in the abdomen with a knife and intentionally inflicting grievous bodily harm, in violation of Article 128, Uniform Code of Military Justice, 10 USC § 928. On appeal, he contends he was prejudiced by certain rulings and instructions of the law officer.

Except for parts of the accused's testimony, the evidence compellingly indicates that, in obscene terms, the accused taunted a group of soldiers celebrating Shrode's birthday, at the Vassincourt Enlisted Men's Club. His "mouthing off" included repeated invitations to "'come over here and fight.'" He was escorted out of the Club by the master-at-arms. Briefly, he peered through a window of the

Club from the outside, then returned to the inside to continue his taunts. Finally, Specialist Alexander Benjert, one of Shrode's group, accepted the invitation. He and the accused fought briefly, with the accused getting the worst of the encounter. After the accused had been knocked to the floor twice, there was a "pause," which was estimated to have lasted from one to four minutes. During the "pause," Benjert drew back from the accused; he told him that if he would say the incident was over "that would be all there was to it." The accused did not reply. Instead, he suddenly rose from the floor. In the same movement, he drew a knife from his pocket, flipped it open, and "lunged" at Shrode, who was standing near Benjert. One witness testified that as the accused came forward he said, " 'I'm going to get you, Shrode,' " and plunged the knife into Shrode's stomach. In the opinion of a medical officer, Shrode was "near death," as the result of the wound.

At the appropriate time, defense counsel requested an instruction on the right of self-defense. The request was denied. As indicated above, nothing in the Government's evidence even hints at the possibility that the accused acted in self-defense. Cf. United States v Campbell, 13 USCMA 531, 33 CMR 63. We have, therefore, scrutinized the accused's own account of the incident. See United States v Vaughn, 15 USCMA 622, 36 CMR 120.

In substance, the accused testified that, although he was "scared of Benjert" and did not want to fight him or anyone else, he continuously shouted obscene remarks at him, Shrode, and the others in the group. These concerned an incident that had taken place several months earlier at the Club. He said, it took " 'five of you to whip one guy' "; and asked, " '[w]hy don't you whip me?' " He was prompted to say what he did because he "kinda resented so many people ganging up on one man," and he was "trying to show off" to this girl in the Club, with whom he had just made a date. Benjert finally came up to him, and the two "scuffled for awhile." They went down to the floor, with Benjert "astraddle"

him. Benjert kept hitting him in the head, and his head kept "hitting the [cement] floor." Then "somehow" he "scooted, kind of," and got up. As he did, he was "drove back" with a blow in the face. He "staggered." Everything "blurred," and he "couldn't see nothing." Someone seemed to be "grabbing on" him, and a lot of people seemed to be "right up close," although he did not know how many were there. He then saw "this white thing [which looked like a white shirt] coming toward" him. Concluding that he had to "get out" or they might "mess . . . [him] up," he took the knife out of his pocket, and slid the blade open with a finger. With the knife in his hand, he made short, jerky movements, from right to left and back. He thought that in doing so, he "could keep them away from . . . [him] so . . . [he] could get out." He had no desire "to mess with them," and only wanted "to scare them." He did not intend to cut anyone. He did not see Shrode; and he did not feel the knife come into contact with anything. He just did not know what happened, except that, as he moved toward the door, he was knocked down and the knife fell out of his hand. The master-at-arms picked him up and told him to go back to the post; so he left the Club.

After an extensive out-of-court discussion of the evidence with counsel and "considerable examination of the facts," the law officer ruled that the accused had "foreclosed himself" from any right to rely upon self-defense. He reasoned that a person cannot provoke an incident, and then excuse himself from responsibility for injury inflicted by him upon another in the course thereof, on the ground of self-defense. See United States v Ginn, 1 USCMA 453, 459, 4 CMR 45; 1 Wharton, Criminal Law and Procedure, § 351 (1957).

A plea of self-defense is a plea of necessity. United States v Duckworth, 13 USCMA 515, 520, 33 CMR 47. "[I]t is generally not available to one who engages with another in mutual combat." United States v Wilson, 5 USCMA 783, 785, 19 CMR 79. Mere words of censure may not amount to

provocation for an assault, but the accused's language went beyond critical comment. He invited the others to try to "whip" him. "Both parties to a mutual combat are wrongdoers, and the law of self-defense cannot be invoked by either, so long as he continues in the combat." Rowe v United States, 164 US 546, 556, 41 L ed 547, 17 S Ct 172 (1896).

An invitation to a fistfight does not irrevocably commit the moving party to a life and death struggle. He may withdraw in good faith from further combat. By such good-faith withdrawal, the "right of self-defense is restored." *Rowe*, supra, page 555. According to the Government's witnesses, Benjert was the one who attempted to withdraw. The accused denied he heard Benjert's offer to desist. The denial did not aid his cause. His testimony contains no suggestion of a word or act that could reasonably be interpreted by the others as indicating he wanted to end the fight. The right of self-defense is not restored to one who provokes or invites another to physical conflict unless he " 'withdraws . . . in good faith, and clearly announces his desire for peace.' " Parker v State, 88 Ala 4, 7 So 98 (1890), cited with approval in *Rowe*, supra, page 556. See also 1 Wharton, Criminal Law and Procedure, § 232 (1957). The law officer, therefore, correctly denied the requested instruction on self-defense.

Turning to the instructions that were given, the accused contends the law officer misstated the evidence in a critical area. The background for the allegation is best set out by direct quotation from the record. After the law officer delineated the elements of the offense, he defined an assault. He then pointed out three "possibilities" the court should consider. The pertinent parts of his remarks are as follows:

"Now, the accused is charged with . . . an assault upon Shrode. . . . Therefore, I wish you to consider what follows the period when the accused had apparently risen from the floor and had in his moving hand the opened knife, and before either he or Shrode moved.

"Consider first, unless the accused at that instant was in a position to inflict bodily harm upon Shrode, he was not assaulting Shrode, and if Shrode chose to rush upon him and was cut, the accused committed no offense.

"Consider second, if the accused at that instant was in a position to assault Shrode, then even though Shrode rushed upon him, the accused may be found to have assaulted Shrode.

"Consider third, if the accused at that instant moved upon Shrode, he may be found to have assaulted Shrode, unless such movement was by mistake. I will instruct you further upon that mistake—such a mistake in just a moment.

"Now, the three possibilities which I have mentioned so far are factual. They are factual questions which you must determine within the elements of the offenses, as I gave you the elements. The prosecution must prove these elements beyond a reasonable doubt. You are, of course, not restricted in your determination to the three possibilities that I have set forth. If others occur to you and you wish instructions thereupon, please do not hesitate to ask for such instructions.

"Now, returning your attention to the period I mentioned before, when the accused had risen from the floor and had in his moving hand the opened knife, you are advised that the accused had at that time, and at any other time during that evening, the right to leave the club unhindered. . . .

"If the accused, exercising his right to go unhindered, attempted to leave the club and could reasonably expect to do so without on his way endangering Shrode with his knife, he was without fault in attempting to leave.

"If, in making such an attempt, the accused was operating under an honest, though mistaken, belief as to

the location of the door and as a result moved toward Shrode instead of the door, and even though in the process he came within range of and cut Shrode, he cannot be convicted of any offense if that belief and the belief that his course would not endanger Shrode were reasonable under all the circumstances, including his possible state of mind from previous blows possibly wrongfully administered. That is, if the accused was trying to move and reasonably thought he was moving toward the door, and had he been moving in the correct direction could reasonably expect to get out without endangering Shrode with his knife, he has committed no offense. He would then have been acting lawfully and the cutting would have been an accident. The prosecution must prove beyond a reasonable doubt that the cutting was not accidental.

"Please note, that when I use the word 'if' such and such is so in the course of these instructions, I do not intend to convey to you that the accused bears any burden of proof. The burden to prove the accused's guilt beyond a reasonable doubt is at all times upon the prosecution."

Appellate defense counsel contend the law officer misconstrued the accused's testimony when he ■ said that the accused drew his · knife before Shrode moved. They maintain this erroneous interpretation "denuded" the second hypothesis of objectivity, and "preempted the ultimate issue." Apparently, defense counsel at the trial construed the accused's testimony in substantially the same way as the law officer. He commented on the point in his final argument as follows: "Is there an assault on Shrode at the time O'Neal was standing with the knife moving it before he moves, or before Shrode moves? . . . He was just standing there, by his testimony, and by the testimony of all the government witnesses." We find no error in the law officer's statement, which provided a convenient starting point for the court-martial to consider the circum-

stances of the infliction of the wound upon Shrode.

It is also contended that the instructions as a whole did not properly present the accused's theory ■ of defense because they ■ allowed the court-martial to predicate guilt upon a finding that the accused merely failed to exercise ordinary care in his attempt to leave the Club. A conviction for aggravated assault cannot be based upon a finding of negligent conduct. United States v Torres-Diaz, 15 USCMA 472, 35 CMR 444. The charge against the accused required the court-martial to find beyond a reasonable doubt that, at the time of the offense, he entertained an intent to inflict grievous bodily harm. The instructions covered the point explicitly. Since the court members had to find affirmatively that the accused entertained a specific intent, there is no fair risk they would, or could, under the instructions, predicate guilt upon the erroneous principle that simple negligence, or careless conduct, in the handling of the knife was sufficient to convict the accused of the offense of intentionally inflicting grievous bodily harm. See United States v Ransom, 4 USCMA 195, 201; 15 CMR 195.

We turn next to the accused's contention that the law officer erred by denying a defense motion for a mistrial. It will be recalled that the accused testified he maligned Shrode's group in order "to show off" to a girl. According to the accused, the girl was then seated in another part of the Club. During cross-examination, he admitted he had read the military police report on the stabbing, and knew what the girl, Dannie Boulanger, had told them "in connection with this thing." He acknowledged she represented that he had threatened her with a knife and she left the Club, apparently before the fight. No objection was made by defense counsel to either the form or the content of trial counsel's cross-examination. However, trial counsel's later references to the alleged threat in his closing argument led defense counsel to move for a mistrial.

Several times in his argument, trial counsel referred to the alleged threat. When he finished the argument, the law officer called for a side-bar conference. He asked trial counsel to indicate the evidence he relied upon to support the references. Trial counsel adverted to the cross-examination of the accused as to the girl's statement to the military police. Defense counsel argued that the cross-examination went "only to impeach the accused's veracity and not [to] establish" the truth of the girl's representations; he contended that trial counsel's remarks had so "engrained" the matter in the court members' minds that no instruction to disregard could possibly "cure the defect." He moved for a mistrial. The law officer denied the motion because, in his opinion, "a positive instruction" to disregard all references to the alleged threat would "cure any prejudice." Immediately, at the end of the side-bar conference, he instructed the court members there was no evidence of any threat to Dannie by the accused, and he directed them to "completely disregard" all mention of the matter. He further instructed that trial counsel's references, which might import such evidence was before them, were "improper" and were to be "disregarded." Later, in his final instructions, he advised the court members that evidence of misconduct other than that charged could not be considered as tending to show accused's "disposition to commit criminal offenses," or as evidence bearing on "the question of his guilt or innocence" of the offense charged.

Apart from the propriety of impeaching the accused with an inconsistent statement made by another, or with an act of misconduct not followed by conviction, there was certainly no competent evidence that he threatened Miss Boulanger. See United States v Britt, 10 USCMA 557, 28 CMR 123. The question then is whether the nature or importance of the alleged offense would cause the court members to disregard the law officer's instructions, and weigh it against the accused in their deliberations, United States v

Krokroskia, 13 USCMA 371, 32 CMR 371.

Not every improper incident at a trial justifies the declaration of a mistrial. United States v ■■■■■■ ■ Waldron, 15 USCMA 628, 36 CMR 126. An explicit instruction to the court members to disregard matter improperly brought to their attention may be sufficient to erase any effect the matter might have had upon them, and leave them free to decide the issues impartially and according to the competent evidence. United States v Hurt, 9 USCMA 735, 27 CMR 3; United States v Shamlian, 9 USCMA 28, 25 CMR 290. Whether a particular situation is correctable by an instruction to disregard or only by a mistrial entails a careful evaluation of many factors, including the reaction of the court members to the incident and their response to the instruction to disregard. The factors are not always reflected in the record of trial. As we observed in United States v Patrick, 8 USCMA 212, 215–216, 24 CMR 22, "[a]n appellate court is detached from the courtroom drama." Necessarily, therefore, the law officer is accorded discretion in his choice of remedy. His ruling will not be overturned on review unless he clearly abused his discretion. United States v Johnpier, 12 USCMA 90, 30 CMR 90.

According to the evidence presented by the Government, the accused's guilt was compellingly demon-■■■■■■ ■ strated. There was, therefore, no reasonable likelihood that the references to the alleged threat would influence the court members in deciding the merits. However, appellate defense counsel contend the threat put the lie to the accused's contention that he taunted Shrode's group only to enhance his status with the girl. Had the accused's purpose in precipitating the fight been in issue, the apparent inconsistency between his testimony about his desire to impress her and the alleged threat would be very unfavorable to the accused, and perhaps impossible to disregard. See United States v Krokroskia, supra. The reason for the accused's taunts,

however, was merely incidental, and entirely preliminary, to the stabbing of Shrode. The accused admitted he invited the group to try to "whip" him, and he admitted he took the knife out of his pocket. The only remaining issue was whether he stabbed Shrode with the intention of inflicting grievous bodily harm. The circumstances of the alleged threat to the girl are vague, but it is still reasonably inferable from the record that they were materially different from those surrounding the offense charged. It was unlikely, therefore, that the court members would be so strongly impressed by the threat to the girl as to resist an instruction to disregard it. The law officer was, therefore, justified in concluding that "a positive instruction" would effectively dispel any impressions the court members may have formed as a result of hearing about the threat. We find no abuse of discretion in his denial of the motion for a mistrial.

Going beyond the effect of the threat on the findings, appellate defense counsel contend ▮▮▮▮▮▮▮ there is a residual risk that it prejudiced the accused as to the sentence. They rely upon United States v Gewin, 14 US CMA 224, 34 CMR 4. In that case, this Court held that an instruction to disregard inadmissible evidence was insufficient as to the sentence because it extended, by its terms, "only to the merits." *Id.*, page 225. *Gewin* is, thus, inapposite. Here, as noted above, the instruction was not so limited. On the contrary, the law officer admonished the court members to "completely disregard" all mention of the matter. He left no doubt the matter was to be expunged entirely from the court members' minds, because it was not evidence in the case. A complete and proper instruction, at an appropriate place in the proceedings, need not necessarily be repeated at a later stage. United States v Williams, 13 USCMA 208, 32 CMR 208. If a further instruction on the point was needed during the sentence procedure, it was, in our opinion, provided by the law officer's direction to the court members to adjudge the sentence only on the "evidence presented in the case." We find no basis in the evidence upon which to conclude there was still a fair risk that, in deliberating upon the sentence, the court members considered the threat to the girl.

The decision of the board of review is affirmed.

Judges FERGUSON and KILDAY concur.