UNITED STATES, Appellee

v.

Aaron R. STANLEY, Sergeant
U.S. Army, Appellant

No. 11-0143

Crim. App. No. 20050703

United States Court of Appeals for the Armed Forces

Argued October 11, 2011

Decided March 22, 2012

ERDMANN, J., delivered the opinion of the court, in which RYAN, J., and EFFRON, S.J., joined. BAKER, C.J., filed a separate opinion concurring in part and in the result, in which STUCKY, J., joined.

Counsel

For Appellant: Mary T. Hall, Esq. (argued); Captain John L. Schriver (on brief); Captain Brent A. Goodwin.

For Appellee: Captain Julie A. Glascott (argued); Colonel Michael E. Mulligan, Major LaJohnne A. White, Major Amber J. Williams, and Captain Benjamin M. Owens-Filice (on brief); Captain Frank E. Kostik Jr.

Military Judge: Timothy Grammel

**This opinion is subject to revision before final publication.**

United States v. Stanley, No. 11-0143/AR

Judge ERDMANN delivered the opinion of the court.

Sergeant Aaron R. Stanley pleaded guilty at a general court-martial to wrongful possession of marijuana with the intent to distribute, wrongful use and distribution of methamphetamines on divers occasions, absence without leave, violating a lawful order of a noncommissioned officer, and adultery, in violation of Articles 112a, 86, 92, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 912a, 886, 892, 934 (2006). Stanley pleaded not guilty to two specifications of premeditated murder and one specification of conspiracy to commit murder in violation of Articles 118 and 81, UCMJ, 10 U.S.C. §§ 918, 881 (2006). He was found guilty of all charges except the conspiracy charge and a panel sentenced him to a reprimand, reduction to E-1, forfeiture of all pay and allowances, confinement for life without the eligibility for parole, and a dishonorable discharge. The convening authority approved the adjudged sentence except for the reprimand, and ordered that Stanley be credited with 271 days of confinement credit. The United States Army Court of Criminal Appeals (CCA) affirmed the findings and the sentence. United States v. Stanley, No. ARMY 20050703, 2010 CCA LEXIS 348, 2010 WL 3927478 (A. Ct. Crim. App. Sept. 29, 2010).

We granted review of this case to determine if the military judge erred by not including the principle of escalation of

force in the self-defense instructions provided to the members.[1]
A military judge is required to instruct members on any
affirmative defense that is "in issue," and a matter is
considered "in issue" when "some evidence, without regard to its
source or credibility, has been admitted upon which members
might rely if they chose." United States v. Lewis, 65 M.J. 85,
87 (C.A.A.F. 2007) (citation and quotation marks omitted). We
hold that the military judge did not err in excluding the
principle of escalation of force in the self-defense
instructions to the members as the principle was not "in issue."

## Background

Stanley, Staff Sergeant Matthew Werner, Sergeant Eric
Colvin, and Specialist Christopher Hymer were all involved in a
criminal enterprise to grow marijuana and manufacture
methamphetamines at a farmhouse rented by Stanley. In the days
leading up to September 13, 2004, the day Stanley killed Werner

---

[1] We granted review of the following issue:

> Whether the military judge's instructions on self-
> defense were incorrect and incomplete, and if so,
> whether the lower court erred in concluding that
> this constituted harmless error.

United States v. Stanley, 70 M.J. 36 (C.A.A.F. 2011) (order
granting review). We also specified an issue regarding the
Article 134, UCMJ, adultery offense in view of our decision in
United States v. Fosler, 70 M.J. 225 (C.A.A.F. 2011). United
States v. Stanley, 70 M.J. 270 (C.A.A.F. 2011) (order granting
review). The specified issue is addressed in the decretal
paragraph.

and Hymer at the farmhouse, the four had been using large amounts of methamphetamines with little or no sleep.

Prior to the incident at the farmhouse, Werner had made death threats against Stanley because he thought Stanley had slept with his wife. In addition, Werner threatened to report their drug activities at the farmhouse to the authorities. Concerned about Werner's threat to call the police, Stanley and Colvin went to the farmhouse to destroy the drugs. Because of Werner's death threats, Stanley went to the farmhouse that night expecting a conflict with Werner and had armed himself with a pistol. When they arrived Stanley and Colvin hid Colvin's truck and went into the farmhouse. Both were armed with firearms. When Werner and Hymer arrived at the farmhouse Stanley hid in a closet where the group stored firearms. The record demonstrates that the incident that followed Werner's and Hymer's arrival at the farmhouse was a rapidly evolving, chaotic situation.[2]

Colvin allowed Werner and Hymer to enter the farmhouse after they claimed they were not armed. Werner accused Colvin of sleeping with his wife and he and Colvin got into a fight

---

[2] Stanley repeatedly testified as to the rapidity of the events at the farmhouse using such words as "super fast," "extremely fast," "really fast," "split second," and "instantly." Moreover, there is nothing in Stanley's rendition of the facts that supports a theory that this fast moving, chaotic affray was a series of discrete altercations.

with Werner grabbing a kitchen knife and cutting Colvin's ear. Colvin was able to disarm Werner but then Hymer joined the fray and Colvin called to Stanley for assistance. While the introduction of the knife to the conflict by Werner did escalate the level of the conflict to that of deadly force, Colvin successfully disarmed Werner. Before Stanley entered the kitchen the conflict between Colvin and Werner had become a physical altercation not involving deadly force.

Stanley then came out of the closet armed with at least a pistol, and, according to Colvin a rifle, and held Werner and Hymer at gunpoint. Stanley retained the pistol while he searched the two for weapons (which he did not find). During this period Hymer grabbed a rifle that Stanley had left in the kitchen and fired at Stanley. Stanley then returned fire with his pistol, killing Hymer. Stanley claimed that Werner then attempted to stab Colvin from behind so he shot and killed Werner in defense of Colvin, a version of the event that Colvin disputed.

Before the CCA, Stanley relied mainly on United States v. Dearing, 63 M.J. 478 (C.A.A.F. 2006), and Lewis, 65 M.J. 85, and argued that the military judge erred by failing to properly instruct the panel regarding Stanley's right during mutual combat to exercise self-defense when the force used against him escalated. Although the CCA did note the differences between

the instant case and Dearing and Lewis, it concluded that "we do not, and need not decide whether the military judge erred in this case. Assuming arguendo that the military judge's instructions were inadequate, we are convinced beyond a reasonable doubt that the error did not contribute to the appellant's conviction or sentence." 2010 CCA LEXIS 348, at *10-*11, 2010 WL 3927478, at *4.

## Discussion

Military judges have substantial discretionary power in deciding on the instructions to give. However, when an affirmative defense is raised by the evidence, an instruction is required. United States v. McDonald, 57 M.J. 18, 20 (C.A.A.F. 2002). Whether a panel was properly instructed is a question of law reviewed de novo. United States v. Ober, 66 M.J. 393, 405 (C.A.A.F. 2008).

Self-defense is an affirmative defense found in Rule for Courts-Martial (R.C.M.) 916(e)(1). It consists of two elements:

> (A) Apprehended, on reasonable grounds, that death or grievous bodily harm was about to be inflicted wrongfully on the accused; and

> (B) Believed that the force the accused used was necessary for protection against death or grievous bodily harm.

An affirmative defense is raised by the evidence when "some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they chose." Lewis,

65 M.J. at 87 (citations and quotation marks omitted).  As we

explained in United States v. Schumacher:

> [T]he military judge must answer the legal question of
> whether there is some evidence upon which members
> could reasonably rely to find that each element of the
> defense has been established.  This test is similar to
> that for legal sufficiency.  Cf. Jackson v. Virginia,
> 443 U.S. 307, 319 (1979); see United States v. Black,
> 3 C.M.A. 57, 60, 11 C.M.R. 57, 60 (1953) ("Assuming
> the truth of each statement made by the accused in
> explanation of his actions, we conclude that neither
> of the distinguishing factors of voluntary
> manslaughter were shown.").

70 M.J. 387, 389-90 (C.A.A.F. 2011).

The question before this court is whether there was "some

evidence" that either Werner or Hymer escalated the level of

force in the conflict that occurred at the farmhouse that would

justify Stanley's use of deadly force.  If so, Stanley was

entitled to a self-defense instruction that was tailored to

include the principle of escalation of force.  R.C.M. 920(a)

Discussion; Ober, 66 M.J. at 405.

We initially note that the defense did not object to the

military judge's instructions at trial in this case.  However,

waiver does not apply to "'required instructions' such as . . .

affirmative defenses[.]"  United States v. Davis, 53 M.J. 202,

205 (C.A.A.F. 2000) (quoting United States v. Taylor, 26 M.J.

127, 128 (C.M.A. 1988) (alteration in original).  While the

escalation of force instruction was not waived by Stanley, the

instruction was not warranted under the facts in this case.

United States v. Stanley, No. 11-0143/AR

In United States v. Cardwell, 15 M.J. 124, 126 (C.M.A.
1983), the court stated that "[t]he theory of self-defense is
protection and not aggression, and to keep the two in rough
balance the force to repel should approximate the violence
threatened."  See also Dearing, 63 M.J. at 483.  The court also
stated in Cardwell that "[e]ven a person who starts an affray is
entitled to use self-defense when the opposing party escalates
the level of the conflict."  Cardwell, 15 M.J. at 126 (citations
omitted).

"'Deadly force' may be defined as force . . . which [its
user] knows creates a substantial risk of death or serious
bodily injury to [another]."  2 Wayne R. LaFave, Substantive
Criminal Law § 10.4(a), at 144 (2d ed. 2003) (citing Model Penal
Code § 3.11(2)).  Under the circumstances of this case, Stanley
escalated a conflict involving a physical altercation between
Werner and Colvin into one involving the use of deadly force
when he came out of the closet and held Hymer and Werner at gun
point, and then used the weapon to subdue them and to forcibly
search them for weapons.[3]  Although the fact that Hymer picked up

---

[3] Compare, e.g., United States v. Moore, 15 C.M.A. 187, 194, 35
C.M.R. 159, 166 (1964) ("one is not per se deprived of the right
to act in self-defense by the fact that he has armed himself and
again sought out his assailant"), and United States v. Black, 12
C.M.A. 571, 575, 31 C.M.R. 157, 161 (1961) ("whether an accused,
by resort to a weapon, uses excessive force in repelling an
assault upon him is dependent upon all of the circumstances"),
with R.C.M. 916(e)(1)-(4) (providing limitations on the use of
force in self-defense), and 2 LaFave § 10.4(a).

a rifle and shot at Stanley did constitute the use of deadly force, at that point the level of the conflict had already been escalated to one involving the use of deadly force by Stanley. See R.C.M. 916(e); United States v. Peterson, 483 F.2d 1222, 1233 (D.C. Cir. 1973) ("One may deliberately arm himself for purposes of self-defense against a pernicious assault which he has good reason to expect.  On the other hand, the true significance of the fact of arming can be determined only in the context of the surrounding circumstances.") (citations omitted); Wallace v. United States, 162 U.S. 466, 472 (1896) ("'if [the accused] was himself violating or in the act of violating the law -- and on account of his own wrong was placed in a situation wherein it became necessary for him to defend himself against an attack made upon himself, which was superinduced or created by his own wrong, then the law justly limits his right of self defense, and regulates it according to the magnitude of his own wrong'" (quoting Reed v. State, 11 Tex. Ct. App. 509, 517-18 (1882))); Cf. Peterson, 483 F.2d at 1233 ("an affirmative unlawful act reasonably calculated to produce an affray foreboding injurious or fatal consequences [holding another at gunpoint] is an aggression which, unless renounced, nullifies the right of homicidal self-defense") (footnote omitted).

In regard to an escalation of force instruction involving Stanley's alleged defense of Colvin, Stanley had intervened in

the fight between Werner and Colvin and Werner had been subdued and searched by Stanley. The issue for the members was simply whether Stanley was entitled to use deadly force in defense of the alleged subsequent knife attack by Werner against Colvin. R.C.M. 916(e)(5). That situation involved a classic self-defense of another situation and escalation of force was not "in issue."

Our case law is clear -- an affirmative defense is "in issue" when "some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they chose." Lewis, 65 M.J. at 87 (citations and quotation marks omitted).[4] In this case, the military judge correctly concluded that self-defense was "in issue" because there was "some evidence" in the record which the members could rely upon if they chose. He properly provided detailed self-defense instructions but did not instruct on the principle of escalation of force because the record lacked any evidence that would trigger his duty to provide such an instruction. In reviewing this case, we agree with the conclusion of the United States Court of Appeals for the District of Columbia in Parker v. United States, 158 F.2d 185 (D.C. Cir. 1946), when it held:

---

[4] We recognize that both Lewis and Dearing were decided after Stanley's trial. However, both cases find a basis in Cardwell. Lewis, 65 M.J. at 88; Dearing, 63 M.J. at 483. Thus, this case does not present a matter of new law, but rather the application of existing law.

United States v. Stanley, No. 11-0143/AR

> [The self-defense instruction], we think, went as far
> as appellant could ask, and, together with
> instructions as to reasonable doubt and presumption of
> innocence, fairly left to the [members] the question
> whether the evidence as a whole was sufficient to show
> that the fatal wound was or was not inflicted in self
> defense.

Id. at 186 (footnote omitted).  Having found no error, we need not address the CCA's analysis concerning prejudice.

## Conclusion

The decision of the United States Army Court of Criminal Appeals is affirmed except as to the findings of guilty to Charge VI and its specification and the sentence.  The portion of the decision of the Court of Criminal Appeals affirming Charge VI and its specification and the sentence is vacated. The record is returned to The Judge Advocate General of the Army for remand to the Court of Criminal Appeals for further consideration in light of United States v. Fosler, 70 M.J. 225 (C.A.A.F. 2011).

BAKER, Chief Judge, with whom STUCKY, Judge, joins (concurring in part and in the result):

I agree with the majority's ultimate conclusion that Appellant was not entitled to an escalation of force instruction. However, I would reach that conclusion for distinct reasons.

In the end, there are only two people alive who know what occurred in the farmhouse that day. They have presented alternative versions of the events. Because Appellant's legal arguments are fact-based, in my view their analysis requires careful review of the facts from both Appellant's and Sergeant (SGT) Colvin's perspective. To simply conclude that Appellant escalated the affray when he exited the closet with a weapon to come to the aid of SGT Colvin avoids the legal question presented: whether there was sufficient evidence before the military judge to have warranted an escalation instruction, regardless of whether this Court ultimately believes one version of events or the other.

Only mutual combatants and aggressors may be entitled to an escalation instruction; the initial point is that for the reasons discussed below, under either Appellant's or SGT Colvin's description of events, Appellant was neither an aggressor nor a mutual combatant when he came out of the closet armed with a gun. An individual who is entitled to act in self-

defense may threaten a greater level of force than that which he or she could actually use. See 2 Wayne R. LaFave, Substantive Criminal Law § 10.4(a), at 144 n.9 (2d ed. 2003) ("mere display of knife to deter onrushing attacker not deadly force" (citing Douglas v. United States, 859 A.2d 641 (D.C. 2004))). Thus, Appellant did not lose his right to self-defense when he exited the closet with a weapon. Moreover, while he was not a mutual combatant at this juncture, the fact that he exited the closet with a weapon is not dispositive as to whether he was later entitled to an escalation instruction. He was not entitled to that instruction later because under either his version of events or that of SGT Colvin, he was never a mutual combatant. Staff Sergeant (SSG) Werner and Specialist (SPC) Hymer were subdued or had fled at the point at which Appellant used deadly force.

## I. BACKGROUND

Appellant and three friends, SGT Colvin, SSG Werner, and SPC Hymer grew marijuana and used and made methamphetamine in a farmhouse leased by Appellant off base. All four soldiers had been using methamphetamine with little or no sleep in the days leading up to the murders. On September 13, 2004, SSG Werner, believing that Appellant and/or SGT Colvin was/were sleeping with his wife, threatened them. SSG Werner and SPC Hymer then went to the farmhouse where they encountered Appellant and SGT

2

Colvin, who were in the process of disposing of the drugs at the farmhouse.

The remaining essential facts regarding the sequence of events at the farmhouse are in dispute, reflecting differences in the testimony, and differing interpretations of the testimony, of the two surviving soldiers, Appellant and SGT Colvin. For the sake of clarity, the conflicting accounts are recounted separately based on Appellant's testimony and SGT Colvin's testimony at trial, respectively. It is this testimony, Appellant argues, that gave rise to the necessity for an escalation of force instruction. The Government also introduced extensive forensic and physical evidence.

A. Appellant's Testimony

Appellant testified consistent with the following account at trial:

On the day of the murders, SSG Werner accused both SGT Colvin and Appellant of sleeping with his wife and threatened to kill Appellant and anyone who got in his way. SSG Werner also threatened to inform the police of their drug operation if Appellant did not face SSG Werner in person. Appellant and SGT Colvin then went to the farmhouse to destroy evidence of the drug operation. Appellant put marijuana in a garbage bag while SGT Colvin smoked cigarettes. While there, SSG Werner and SPC Hymer arrived and banged on the door and eventually got in.

Appellant hid in a closet containing a number of guns, including a .22 pistol and an 8mm Mauser rifle. While in the closet, he peaked through a crack in the hinges and saw SPC Hymer walk by with something black, which he thought was a gun, in his hand.

Appellant heard SGT Colvin call out for help and so he came out of the closet carrying the pistol, which holds ten rounds in the clip and one in the chamber. He aimed it at SPC Hymer and told him not to move. SSG Werner and SGT Colvin were on the floor fighting over a knife. SGT Colvin yelled that SSG Werner had "stabbed him." Appellant searched SPC Hymer for weapons, partially pulling his pants down in the process, but he was unarmed. He then searched SSG Werner for weapons and pulled his sweatpants off to check that he was unarmed.

While Appellant was searching SSG Werner, SPC Hymer picked up a rifle (8mm Mauser) that had been in the corner, pointed it at Appellant, and pulled the trigger. The weapon dry fired. Then SPC Hymer chambered a round and fired at Appellant as Appellant was running away. Appellant came back and returned fire at SPC Hymer while the latter was running away towards the living room. He continued firing until SPC Hymer went down.

Seconds later, Appellant saw SSG Werner, who was on one or two knees in the kitchen, attempting to stab SGT Colvin in the back. SGT Colvin, who was on his knees facing in the direction of Appellant and SPC Hymer, had his hands up and said "No" after

SPC Hymer was shot.  Appellant shot SSG Werner, causing him to fall backwards, until the gun was empty.  Both victims died shortly thereafter while Appellant went to get help.

B.  SGT Colvin's Testimony

SGT Colvin testified consistent with the following account at trial:

On the day of the murders, SSG Werner accused Appellant of sleeping with his wife and threatened to harm Appellant and SGT Colvin.  SSG Werner also threatened to inform the police of their drug operation if Appellant did not face SSG Werner in person.  Appellant and SGT Colvin then went to the farmhouse to destroy evidence of the drug operation; in the car Appellant was waiving SGT Colvin's .22 Buckmark pistol around saying they had to get to the farmhouse.  When they got there, SGT Colvin picked up his 308 Remington 700 rifle; Appellant took the .22 pistol and he had a slap jack (sap) in his back pocket.[1]  SGT Colvin smoked cigarettes in the bathroom while Appellant gathered up the drugs.  Appellant went in and out of the house, tried to flush drugs down the toilet, and gathered marijuana into a garbage bag.

SSG Werner and SPC Hymer arrived and tried to get inside the house but the chain was on the door.  SGT Colvin let the two

---

[1] According to SGT Colvin's testimony, a slap jack is "a piece of lead covered in leather, made to hit people in the head and knock them out."

men in when they said they were unarmed and set the rifle he was carrying down in the doorway to the pantry.

SSG Werner said that SGT Colvin and Appellant had slept with his wife, which SGT Colvin denied doing. SSG Werner then hit SGT Colvin in the forehead with a right-cross punch. SGT Colvin hit him back with a right-cross punch. SSG Werner grabbed a kitchen knife and cut SGT Colvin's ear. After that, SGT Colvin "tried to disarm" SSG Werner and tripped him so both men were on the ground fighting. SGT Colvin was able to "beat on [SSG Werner] until [he] got the knife out of his hand," and he threw the knife away. While they were fighting SPC Hymer came over and started kicking SGT Colvin in the head.

At this point, SGT Colvin called out for help to Appellant. This call caused SPC Hymer to leave the room and go to the dining room and then the living room looking for Appellant. Appellant came out of the closet with a pistol (.22 Buckmark pistol) and rifle (8mm Mauser) and met SPC Hymer in the living room and held him at gunpoint. SPC Hymer then walked backwards into the kitchen with his hands up in a position of surrender. Appellant set the rifle down in the doorway to the dining room and searched SPC Hymer. He then searched SSG Werner, whom SGT Colvin had been laying on top of, for weapons at the point of his pistol. In the process, Appellant pulled SSG Werner's sweatpants off because SSG Werner had told SGT Colvin he had a

6

gun in his waistline.  No gun was found on SSG Werner.
Appellant stepped back and tripped over SGT Colvin's rifle,
which Appellant then went to throw on the porch.  SGT Colvin
still had SSG Werner in the "hurt locker"[2] at that time.  SPC
Hymer then grabbed the rifle that Appellant had placed in the
corner.

SPC Hymer pointed the rifle at SGT Colvin and pulled the
trigger, but the rifle dry-fired.  This caused SGT Colvin to get
off of SSG Werner, whom he had been laying on.  Then SPC Hymer
chambered a round and fired at Appellant but missed, hitting the
wall instead.  SPC Hymer immediately turned and started to run
into the dining room.  Appellant came running from the porch and
fired at SPC Hymer until the latter's legs gave out while he was
in the living room.  SPC Hymer fell to the ground face down in
the entrance to the living room.  Appellant shot SPC Hymer twice
more while he lay on his stomach, wounded and defenseless.
After he fired, Appellant said, "He's fucking dead, he's dead,"
in a loud, aggressive way.

Appellant walked back into the kitchen, stood at the feet
of SSG Werner, who was unarmed and in a prone position.
Appellant said "I didn't fuck your wife and now you are going to

---

[2] "Hurt locker" is a slang term for being in pain or in a place
in which a person does not want to be.  See generally BBC News
Magazine, What Is a 'Hurt Locker'?,
http://news.bbc.co.uk/2/hi/8555318.stm (last modified Mar. 8,
2010).

die." SSG Werner put his hands up and said "[p]lease, man" in a tone of fear. He fired at SSG Werner until the slide locked to the rear, signifying that the ammunition was expended. Appellant fired the gun downward from about his waist. By the final shot, he had stepped forward and was shooting "almost directly into [SSG Werner's] face" with the gun held at Appellant's knee level. When the first shot was fired SSG Werner's head was "propped up against the wall"; as bullets were coming SGT Colvin described that SSG Werner had his hands up around his face.[3] SGT Colvin described that, as SSG Werner was being shot, SSG Werner's head turned to the right and he flinched up with his left shoulder a bit off the ground and his chin moved to the right.

SGT Colvin yelled "Stanley!" and Appellant then pointed the gun at SGT Colvin. SGT Colvin stood up and took the empty pistol from Appellant's hands and set it on the counter. Then Appellant told SGT Colvin that they had to bury the two men, but SGT Colvin said they had to get help. Appellant took SGT Colvin's truck to try and get help. SSG Werner died shortly thereafter. SGT Colvin saw that SPC Hymer was still alive and so he dragged him out to their truck and started driving to the nearest town, but SPC Hymer stopped talking shortly thereafter.

---

[3] At trial, SGT Colvin acted out what he had observed, and trial counsel described this for the record.

C. At Trial

At trial, Appellant's defense was that he acted in self-defense after SPC Hymer fired the first shot and that he acted in defense of another when he shot SSG Werner after seeing him raise a knife and attempt to stab SGT Colvin. The Government presented SGT Colvin's version of events arguing that Appellant shot the victims while they were defenseless. At the conclusion of the evidence, the military judge provided both counsel with the instructions he proposed to give and asked whether they had any objections. Neither the Government nor Appellant objected. The military judge then asked whether they requested any additional instructions; the Government and Appellant responded that they did not.

D. Military Judge's Instruction

In addition to the standard instructions on self-defense and defense of another, the military judge provided instructions relating to provocation, mutual fighting, and withdrawal. The relevant portions of the military judge's instructions are as follows:

> There has been some evidence in this case concerning the accused's ability to leave or move away from his assailants. A person may stand his ground when he is at a place at which he has a right to be. Evidence tending to show that the accused had or did not have an opportunity to withdraw safely is a factor that should be considered along with all other circumstances in deciding the issue of self-defense. . . .

. . . .

There exists evidence in this case that the accused may have been a person who intentionally provoked the incident or was a person who voluntar[il]y engaged in mutual fighting. A person who intentionally provoked an attack upon himself or voluntarily engaged in mutual fighting is not entitled to self-defense, unless he previously withdrew in good faith. A person has provoked an attack, and therefore given up the right to self-defense, if he willingly and knowingly does some act towards the other person reasonably calculated and intended to lead to a fight or a deadly conflict. Unless such act is clearly calculated and intended by the accused to lead to a fight or a deadly conflict, the right to self-defense is not lost. A person may seek an interview with another in a non-violent way for the purpose of demanding an explanation of offensive words or conduct or demanding redress of offensive words or conduct or demanding redress of a grievance without giving up the right to self-defense. One need not seek an interview in a friendly mood. The right to self-defense is not lost merely because the person arms himself before seeking the interview.

The burden of proof on this issue is on the prosecution. If you are convinced beyond a reasonable doubt that the accused intentionally provoked an attack upon himself so that he could respond by injuring or killing Specialist Christopher Hymer or Staff Sergeant Matthew Werner, or that the accused voluntarily engaged in mutual fighting, then you have found that the accused gave up the right to self-defense. However, if you have a reasonable doubt that the accused intentionally provoked an attack upon himself or voluntarily engaged in mutual fighting then you must conclude that the accused retained the right to self-defense, and then, you must determine if the accused actually did act in self-defense.

Even if you find that the accused intentionally provoked an attack upon himself or voluntarily engaged in mutual fighting, if the accused later withdrew in good faith and indicated to his adversary a desire for peace by words, or actions, or both, and if Specialist Christopher Hymer or Staff Sergeant Matthew Werner revived the conflict or fight, then the accused was no longer voluntarily engaged in mutual fighting or provoking an attack, and was entitled to act in self-defense.

10

> If you have a reasonable doubt that the accused remained a person provoking an attack or a voluntary mutual combatant at the time of the offense, you must find that the accused did not lose the right to act in self-defense, and then, you must decide if the accused acted in self-defense.

The military judge also made clear that the instructions on "provocateur and mutual combatant . . . and withdrawal that I gave you for self-defense also apply to defense of another." Defense counsel did not object to these instructions.

E.  Ruling of the Court of Criminal Appeals

Before the lower court, Appellant argued that the military judge's instructions were deficient because he failed to instruct the members that a mutual combatant has the right to escalate violence under certain circumstances without losing the right to self defense and that "some mutual combatants may be unable to withdraw, and therefore retain their right to self defense."  United States v. Stanley, No. ARMY 20050703, 2010 CCA LEXIS 348, at *8, 2010 WL 3927478, at *3 (A. Ct. Crim. App. Sept. 29, 2010) (unpublished).

The CCA noted the differences between the instant case and United States v. Dearing, 63 M.J. 478 (C.A.A.F. 2006), and United States v. Lewis, 65 M.J. 85 (C.A.A.F. 2007), but concluded that "we do not, and need not decide whether the military judge erred in this case.  Assuming arguendo that the military judge's instructions were inadequate, we are convinced

beyond a reasonable doubt that the error did not contribute to the appellant's conviction or sentence."  2010 CCA LEXIS 348, at *10, *11, 2010 WL 3927478, at *4.  The CCA stated:

> We believe SGT Colvin's version of events because it is consistent with the substantial forensic evidence in this case.  Admittedly, the defense exposed SGT Colvin's potential weaknesses in credibility, but unlike appellant's his version rings true on the most important points concerning the murders themselves. The position and direction of the wounds in the victims, the blood spatter evidence, the location of pooled blood, the location of shell casings throughout the house, the absence of a knife in the vicinity of SSG Werner when he was shot, and testimony from recognized crime scene experts all support SGT Colvin's testimony.

Id. at *11, *12, 2010 WL 3927478, at *4.  The CCA also noted inconsistencies between statements made by Appellant at various times as well as inconsistencies with the crime-scene and forensic evidence.  Id. at *12, *13, 2010 WL 3927478, at *5.  It ultimately concluded that the absence of the additional instructions on escalation of force and inability to withdraw "did not contribute to appellant's conviction or sentence."  Id. at *14, 2010 WL 3927478 at *5.

## II.  DISCUSSION

One who is a mutual combatant or initial aggressor is generally not entitled to use self-defense.  Rule for Courts-Martial (R.C.M.) 916(e)(4); see United States v. O'Neal, 16 C.M.A. 33, 36-37, 36 C.M.R. 189, 192-93 (1966).  This is because "'[b]oth parties to a mutual combat are wrongdoers, and the law

12

of self-defense cannot be invoked by either, so long as he continues in the combat.'" O'Neal, 16 C.M.A. at 37, 36 C.M.R. at 193 (quoting Rowe v. United States, 164 U.S. 546, 556 (1896)). Moreover, mutual combatants by definition are considered to have implicitly or explicitly agreed to fight on certain terms.

However, an initial aggressor or mutual combatant can regain the right to self-defense when the opposing party escalates the conflict, or where he withdraws from the conflict and is reengaged. Lewis, 65 M.J. at 88-89. In such a case, the accused is entitled to use that force reasonably necessary to deter or defend against the opposing party's use of escalated force. If the accused reasonably apprehended that he would suffer "death or grievous bodily injury," id. at 89, he "is entitled to use deadly force in his own defense, just as he would be if, after initially attacking, he had withdrawn completely from combat and was then attacked by his opponent." United States v. Cardwell, 15 M.J. 124, 126 n.3 (C.M.A. 1983). For example, if A strikes B with a light blow, and B responds by attempting to stab A, A is entitled to use reasonable force to defend the attack. However, if the accused enters willingly "into combat with the expectation that deadly force might be employed, he is not allowed to claim self defense." Id.

Finally, an instruction on self-defense does not automatically require inclusion of language about escalation of force.  See, e.g., United States v. Martinez, 40 M.J. 426, 429-30 (C.M.A. 1994) (military judge instructing for self-defense but not escalation).  An escalation instruction is only required if the evidence in the case reasonably places escalation in issue.  This might occur, for example, where as in Dearing and Lewis, a mutual combatant in a fist-fight is confronted by an opponent who is joined by multiple allied opponents and the mutual combatant has no opportunity to withdraw.  Dearing, 63 M.J. at 480; Lewis, 65 M.J. at 86-87.

Whether the issue of escalation is raised in this case is premised on the assumption that the accused was engaged in mutual combat.  See Lewis, 65 M.J. at 89.  Otherwise, the scenario presented is one of mere self-defense.  In this case, the parties do not dispute that the defense of self-defense was affirmatively raised with respect to Appellant either acting in his own defense or in the defense of SGT Colvin.  The military judge provided such an instruction.  Appellant now argues, with the benefit of appellate hindsight, that the facts reveal that Appellant was engaged in mutual combat with SSG Werner and/or SPC Hymer and there came a time, or times, when SSG Werner, SPC Hymer, or both, escalated their use of force, such that the members should have been instructed to consider whether

14

Appellant was then entitled to respond as he did, by shooting SPC Hymer and later shooting SSG Werner.

In order for Appellant to be entitled to an escalation instruction, the evidence would need to support the theory that he was at some point engaged in mutual combat with SSG Werner and SPC Hymer and that his opponents escalated the use of force, first when SPC Hymer seized a gun and attempted to shoot Appellant and later when SSG Werner threatened to stab SGT Colvin in the back. The majority opinion addresses this question by concluding that because Appellant entered the affray at the outset with a gun, there could be no opportunity for escalation, regardless of the facts. If the affray is viewed as one continuous event, this is a plausible explanation. But it avoids the legal questions presented. First, it assumes, without consideration of United States v. Moore, see discussion infra note 5, that one who enters an affray with a gun cannot under any circumstances regain the right of self-defense or find him or herself in a context warranting an escalation instruction. Second, it avoids the question of whether, considering the alternative rendering of events offered by Appellant, there came a time when the affray should have been viewed as a series of altercations, at least one of which raised sufficient evidence to warrant an escalation instruction.

The question we must ask in reviewing the record in its entirety is whether the military judge was required to affirmatively instruct on the basis of the accused's appellate theory of escalation.  To answer this question, we look in turn at the facts surrounding the death of SSG Werner and then the death of SPC Hymer.

### As to SSG Werner

The facts in evidence as to how the fight between SSG Werner and SGT Colvin started come from SGT Colvin's testimony, since both eyewitnesses agree that Appellant was not in the room at that time.  SGT Colvin testified at trial that he let SSG Werner and SPC Hymer into the house because they said they were unarmed.  SGT Colvin then placed his rifle down in the doorway to the pantry.  SSG Werner accused SGT Colvin and Appellant of having slept with his wife and then punched SGT Colvin in the forehead.  SGT Colvin hit SSG Werner back, and then SSG Werner grabbed a kitchen knife and cut SGT Colvin's ear.

For an escalation instruction to be required in the defense of another case, the evidence would have to show that SGT Colvin was a mutual combatant, that SSG Werner escalated the fight when he cut SGT Colvin's ear, and that the fight continued up to the point when SSG Werner allegedly attempted to stab SGT Colvin in the back.  This argument is unpersuasive for two reasons, both supported by uncontroverted evidence presented at trial.

16

First, SGT Colvin was not a mutual combatant in the initial fight with SSG Werner and therefore never lost his right to self-defense, and thus Appellant did not lose his right to act in defense of another. At the time when SSG Werner hit SGT Colvin, the latter was unarmed and did not pose a threat to SSG Werner. SSG Werner had been "circl[ing] around [SGT Colvin] and just started threatening [him]." SGT Colvin was entitled to respond with reasonably necessary force to the punch provided that he reasonably believed that SSG Werner continued to pose a threat. See R.C.M. 916(e)(3).[4] Therefore, when SGT Colvin

---

[4] R.C.M. 916(c)(3) provides:

It is a defense to any assault punishable under Article 90, 91, or 128 and not listed in subsection (e)(1) or (2) of this rule that the accused:

(A) Apprehended, upon reasonable grounds, that bodily harm was about to be inflicted wrongfully on the accused; and

(B) Believed that the force that accused used was necessary for protection against bodily harm, provided that the force used by the accused was less than force reasonably likely to produce death or grievous bodily harm.

The Discussion to R.C.M. 916(e)(4) clarifies the rule on retreat:

Failure to retreat, when retreat is possible, does not deprive the accused of the right to self-defense if the accused was lawfully present. The availability of avenues of retreat is one factor which may be considered in addressing the reasonableness of the accused's apprehension of bodily harm and the sincerity of the accused's apprehension of bodily harm

17

punched SSG Werner back, he did not lose his right to self-defense. Neither did Appellant lose his right to come to the defense of another with reasonable force. Thus, the appropriate instruction at this point was defense of another without any accompanying instruction on escalation of force.

Second, even if SGT Colvin were a mutual combatant in the initial fight with SSG Werner, the affray did not continue unabated from then until the later time when, according to Appellant, SSG Werner allegedly tried to stab SGT Colvin in the back. SGT Colvin testified that when SPC Hymer attempted to shoot Appellant it "caused me to get off Staff Sergeant Werner." He also testified that, after the initial fight, SSG Werner had become "submissive" and went "from biting [SGT Colvin] to just laying there placid." These uncontroverted facts show that the fight between SGT Colvin and SSG Werner did not continue up to the point when SSG Werner was shot. Such facts could give rise to the necessity for an instruction on the right to self-defense after SSG Werner attacked SGT Colvin with his fists and then a knife. But the initial confrontation between SSG Werner and SGT Colvin came to an end when Appellant came to the aid of SGT Colvin and subdued SSG Werner. As a result, Appellant's escalation argument is not supported by the record.

_____

and the sincerity of the accused's belief that the force used was necessary for self-protection.

18

As to SPC Hymer

While he was fighting on the floor with SSG Werner, SGT Colvin called out to Appellant.  This caused Appellant to come out of the closet, armed with at least a .22 pistol, which he pointed at SPC Hymer.  Appellant held SPC Hymer at gunpoint and walked him back into the kitchen with his hands up.  Appellant searched SPC Hymer for weapons, partially pulling down his pants in the process.  At that point, SPC Hymer was unarmed and either sitting or lying down on the ground.  Appellant testified at trial that, after checking SPC Hymer for weapons, he did not consider him a threat:  "I thought Hymer was cool, that he was just there.  He wasn't a threat to me."  Appellant also described SPC Hymer as "laying on his stomach with his hands out . . . much like you would do when you put an enemy prisoner of war on the ground"; he had his hands "up above his head . . . palms to the floor."  At that point, SPC Hymer no longer posed an immediate threat to Appellant or SGT Colvin.

Once SPC Hymer had been disarmed and was either sitting or lying down on the ground, his participation in the initial fight ended.  Thus, when SPC Hymer grabbed the rifle in the corner and fired at Appellant, he began a new fight.  Whatever he was before this point, Appellant could not now have been engaged in mutual combat.  Therefore it was not possible for SPC Hymer to escalate the fight.  That Appellant was in the process of

19

disarming SSG Werner when SPC Hymer fired at him does not change the fact that Appellant and SPC Hymer were not mutual combatants, since SPC Hymer had been subdued and was no longer a participant in the fight with Appellant or SGT Colvin.

In any event, the parties agree that, when SPC Hymer committed a new assault by firing on Appellant, Appellant had the right to defend himself. Appellant then fled from the house onto the porch, without pursuit from SPC Hymer. In such context, it is not clear how Appellant could then be entitled to an escalation instruction, when it was Appellant who then reentered the farmhouse to fire upon SPC Hymer.

For the foregoing reasons, the military judge did not abuse his discretion in instructing the members. I agree that we need not address the second clause of the granted issue and the CCA's harmless error analysis.

### The Court's Opinion in this Case

The Court's analysis divides at the point at which Appellant exits the closet. The majority concludes that at this point the question of an escalation instruction was over because it was Appellant who escalated the conflict when he exited the closet with a gun. However, as discussed earlier, the record does not show that Appellant was then an aggressor or mutual combatant. When he exited the closet, displayed the weapon, and subdued SSG Werner and SPC Hymer, if anything, he deescalated

20

the situation.  Moreover, Appellant's exiting the closet with a gun and search of SPC Hymer and SSG Werner did not constitute the "use" of deadly force.  Though Appellant may not have been legally authorized to use deadly force when he came out of the closet, his display of deadly force appears to have been justified under either Appellant's or SGT Colvin's recitation of events.

The Court's opinion suggests that Appellant was unjustified in offering deadly force and that therefore his display of a gun upon exiting the closet and his search of SPC Hymer and SSG Werner somehow constituted the "use" of deadly force.  In this regard, the Court's reliance on United States v. Peterson, 483 F.2d 1222 (D.C. Cir. 1973), is misplaced since the facts are completely different from the facts in this case.

In Peterson, the victim and two friends were attempting to remove windshield wipers from the defendant's wrecked car.  Id. at 1225.  When the defendant saw them, a verbal altercation ensued.  Id.  The defendant went back into the house and got a pistol.  Id.  The victim and his friends were attempting to leave when the defendant came out and pointed the gun at the victim and said if he left he would shoot him.  Id.  The victim threatened the defendant with a lug wrench, and the defendant proceeded to shoot the victim, killing him.  Id. at 1225-26.  Although there was some dispute on the details of what happened,

21

the evidence was "uncontradicted that when [the defendant] reappeared in the yard with his pistol, [the victim] was about to depart the scene." Id. at 1232 (footnote omitted).

The facts in Peterson simply do not correlate to the facts in this case. The defendant in Peterson, having retreated to a place of safety, then committed an "affirmative unlawful act reasonably calculated to produce an affray foreboding injurious or fatal consequences" when he returned from the house with a pistol and threatened to kill the victim -- who was about to leave -- if he moved. Id. at 1233. In this case, it is uncontested that SSG Werner had previously threatened to kill Appellant and that Appellant came out of the closet only after he heard SGT Colvin cry out for help. The majority does not explain how Appellant's coming out of the closet to aid his friend, who had just been cut in the ear with a knife, constitutes an "affirmative unlawful act reasonably calculated to produce an affray foreboding injurious or fatal consequences." Id.

It is well established that the mere threat of the use of deadly force is not the same as the actual use of deadly force.[5]

---

[5] It is also well established that a defendant who comes armed to an interview does not automatically lose his right to self-defense. United States v. Moore, 15 C.M.A. 187, 193-94, 35 C.M.R. 159, 165-66 (1964) ("It is settled law, therefore, that one is not per se deprived of the right to act in self-defense

Deadly force means "force that the actor uses with the purpose of causing or that he knows to create a substantial risk of causing death or serious bodily injury." Model Penal Code § 3.11(2) (1962). Thus, a person is said to use deadly force if he fires at another with the intent to kill or do serious bodily harm even though he misses or only causes minor injury. Threatening death or serious bodily harm, without intention of carrying out the threat, does not constitute the use deadly force. Douglas, 859 A.2d at 642; 2 LaFave, supra § 10.4(a). Thus, "one may be justified in pointing a gun at his attacker when he would not be justified in pulling the trigger." 2 LaFave, § 10.4(a), at 144 (citing United States v. Black, 692 F.2d 314 (4th Cir. 1982); Stewart v. State, 672 So.2d 865 (Fla. App. 1996); Commonwealth v. Cataldo, 668 N.E.2d 762 (1996); State v. Moore, 729 A.2d 1021 (1999)).

A person who reasonably believes that an attacker is about to inflict any bodily harm may lawfully defend him or herself by offering to use deadly force, even though the person would not be entitled to actually use deadly force. R.C.M. 916(e)(2) ("It is a defense to assault with a dangerous weapon or means likely to produce death or grievous bodily harm that the accused: (A) Apprehended, on reasonable grounds, that bodily harm was about

---

by the fact that he has armed himself and again sought out his assailant.").

to be inflicted wrongfully on the accused; and (B) In order to deter the assailant, offered but did not actually apply or attempt to apply such means or force as would be likely to cause death or grievous bodily harm."); United States v. Marbury, 56 M.J. 12, 19 (C.A.A.F. 2001) (Gierke, J. dissenting). Therefore, regardless of whether SSG Werner still had the knife when Appellant entered the kitchen, Appellant would have been entitled to display deadly force if he feared any bodily harm to himself or to SGT Colvin at that point. The majority opinion conflates the concept of the display of a dangerous weapon with the concept of the use of deadly force. Consequently, I disagree that the record in this case supports the contention that, when SPC Hymer picked up the rifle and shot at Appellant, Appellant "had already . . . escalated [the conflict] to one involving the use of deadly force." See United States v. Stanley, __ M.J. __ (9) (C.A.A.F. 2012). Moreover, Appellant's arguments warrant a careful review of the facts, from both witnesses' perspectives, before reaching a conclusion that there was insufficient evidence to warrant an escalation instruction.

### III. CONCLUSION

For the foregoing reasons, I concur in the result and would therefore affirm the decision of the United States Army Court of Criminal Appeals on that basis.